# THOMPSON *v.* SIOUX FALLS NATIONAL BANK.

## ERROR TO THE SUPREME·COURT OF THE TERRITORY OF DAKOTA.

No. 53. Argued October 24, 25, 1893. — Decided November 20, 1893.

In an action at law against a bank to recover on a cheque drawn and issued by its cashier, if it be admitted that the cheque was obtained without consideration, and was invalid in the hands of the immediate payee, the plaintiff must prove either that he was a *bona fide* holder, or that the person from whom he received the paper had taken it for value without notice of defect in its inception.

A bank, knowing that the county treasurer of the county had not sufficient county funds in his hands to balance his official accounts, consented to give him a fictitious credit in order to enable him to impose upon the county commissioners, who were about to examine his accounts. They accordingly gave him a " cashier's check " for $16,571.61, which he endorsed and took to the commissioners. They received it, but refused to discharge him or his bondsmen, and placed the cheque and such funds as he had in cash in a box and delivered them to his bondsmen. The latter deposited the money and the cheque in another bank in the same place, which bank brought suit against the bank which issued the cheque to recover upon it. *Held,*

(1) That the circumstances under which the cheque was issued were a plain fraud upon the law, and also upon the county commissioners;

(2) That their receipt of it and turning it over to the sureties was a single act, intended to assist the sureties in protecting themselves, and was inconsistent with the idea of releasing them from their obligation;

(3) That the question whether the evidence did or did not establish the fact that the county was an innocent holder should have been submitted to the jury.

THIS was an action brought by the Sioux Falls National Bank, defendant in error, against the First National Bank, to recover the amount of the following cashier's cheque, issued by an officer of the defendant bank:

"No. 91.            Sioux Falls, Dak., Jan. 12, 1886.

"THE FIRST NATIONAL BANK OF SIOUX FALLS.

"Pay to the order of C. K. Howard, Co. Treas., sixteen thousand·five hundred and seventy-one and 61–100 dollars.

"$16,571.61.          (Signed)    W. F. FURBECK, Cash."

Across the face of this was printed " cashier's check." It was endorsed " C. K. Howard, County Treasurer."

The complaint alleged in substance that the cheque was issued for value received, delivered to Howard, endorsed by him, and that "it came lawfully into the possession of the plaintiff, in the usual course of business," on January 13, 1886, and that the "plaintiff is now the legal owner and holder of the same."

The bank answered, admitting the drawing of the cheque, and alleged in substance that the cheque did not come lawfully into the possession of the bank in the usual course of business, and that its acquisition by the bank was *ultra vires*.

The action was begun January 14, 1886, two days after the cheque was drawn, against the then sole defendant, the First National Bank; and about six weeks thereafter, namely, March 1, an attachment was issued upon the ground that the defendant had or was about to assign and dispose of its property with intent to defraud its creditors, and levied upon the moneys, notes, drafts, stock, and other assets of the bank, in the aggregate estimated value of over $120,000. Of this property, the sheriff returned or tendered to the defendant on March 5 all except assets of the estimated value of $27,541.21, consisting of coin, notes, &c.

The issue of this attachment was followed by the failure of the bank, and the Comptroller of the Currency appointed Thompson, plaintiff in error, receiver on March 11. On March 31, 1886, the sheriff delivered to Thompson, as receiver, the assets remaining in his hands, in the above amount of $27,541.21. Acting under advice of the Comptroller, on December 28, 1886, the receiver applied to the court for an order substituting him as party defendant in the place of the bank, and the court thereupon made him an *additional* party. The receiver excepted to the order, claiming the absolute right of substitution.

Upon the trial, evidence was introduced tending to show the following facts: On January 12, 1886, the date of the cheque, Charles K. Howard was county treasurer of the county of Minnehaha, an office which he had held for several years, and

was having his semi-annual settlement as such county treasurer with the board of county commissioners. From the time of its organization to the date of this settlement, Howard had kept his official deposit as treasurer with the First National Bank of Sioux Falls, of which J. B. Young and H. L. Hollister, down to a short time before the issue of this cheque, had been president and cashier respectively; and at the time of this settlement Young and Hollister, together with C. G. Coats and W. H. Corson, were the sureties of Howard upon his official bond.

Howard was confessedly a defaulter, that is, he had not funds of the county sufficient to meet his liabilities, and to enable him to make his settlement with the commissioners he had applied to the defendant bank for assistance. After he had checked over his accounts with the commissioners, he went to the defendant bank for $16,571.61, the amount needed. He had about $12,000 on hand in a box in the treasurer's vault, which, with the $16,571.61, would balance his accounts. He had nothing deposited to his credit at the bank. To make up the required amount he gave the bank three drafts upon Chicago, aggregating $15,000, telling the cashier, however, that he had no credit there which would obtain the payment of them. The bank thereupon gave him a deposit book showing a deposit to his credit of $15,625.01, which he exhibited to the commissioners, who said that no doubt that was all proper, but they would like to have some little further assurance that he had the money. He then went to the bank, procured and exhibited to the commissioners a letter, of which the following is a copy:

" First National Bank, Sioux Falls, Dak.

"*January* 12, 1886.

" The books of the bank show a credit in favor of the county of $15,625.01. If you wish you have the privilege of examining the books.

"R. J. WELLS, P't.

"W. F. FURBECK, Cas."

The board would not make a settlement without the money or a certified cheque. Howard returned to the bank, and asked the cashier for a certified cheque, but was refused. The cashier thereupon gave him the cheque in suit, with the condition that he would retain possession of it, deliver it to no one, and return it in twenty minutes, and would also place to the credit of the county in the bank what money he had in his possession, as county treasurer, some twelve or fourteen thousand dollars. This was after the closing of the bank for the day's business.

Howard gave nothing for this cheque, nor was it charged to any one on the books of the bank. He did not return the cheque nor make any deposit whatever, but took it to the board of commissioners then in session, and endorsed it at the request of the board. That, with the county money he then had in his possession, was sufficient to balance his account and discharge his obligation to the county. Thereupon Hollister, Coats, and Corson, three of the four sureties upon his bond, through one Bailey, their attorney, demanded that they be released from further liability upon Howard's official bond.

On the following morning, namely, January 13, the board of county commissioners deeming Howard's sureties insufficient for the protection of the county, because one of the sureties, Young, had removed from the State, adopted a resolution requiring the treasurer to furnish additional freehold sureties in the penal sum of $50,000, and at the same time, at the request of the three remaining sureties, resolved that the funds presented to the board of county commissioners by the treasurer, in settlement of his accounts, be turned over to his bondsmen and the bondsmen put in charge of the office of county treasurer until the additional bond was furnished, the funds to be deposited and remain the funds of Minnehaha County.

The funds of the treasurer, including this cheque, were then placed in a tin box, and delivered into the hands of the bondsmen, who took them in the box to the Dakota National Bank in the city of Sioux Falls, and offered the same for deposit. In going to the Dakota National Bank they passed the First National Bank, which was located on the opposite side of the street. The Dakota National Bank refused to receive, give

credit, or purchase the cheque without the endorsement of the bondsmen or indemnity from them. The cheque was, at the request of the bondsmen, presented to the First National Bank for payment, which was refused. The box containing the funds was left at the Dakota National Bank by the bondsmen during the noon hour. While the bondsmen and officers of the Dakota National were at dinner, or soon after this, Bailey, on behalf of the bondsmen, called at the plaintiff bank and had an interview with McKinney, its president, in which Bailey said he had been engaged on behalf of the bondsmen of Mr. Howard, that Young had left and they wished to be released, and that the office had been turned over to the bondsmen with the money. In this conversation McKinney expressed the wish to obtain the deposit for his own bank. Prior to this conversation he had made some inquiries of different parties about the county treasurer's deposit, and about the settlement and the cheque, and had asked if it was a straight cashier's cheque. Receiving a reply in the affirmative, he said: "I would like to have it; they would either pay it or close their doors." About 2 o'clock, the bondsmen, Hollister, Coats, and Corson, went back to the Dakota National Bank, took the box and money, including this cheque, went out of the back door of the bank, (which was in the same block and on the same side of the street as the plaintiff bank,) and, following along the river bank behind the buildings which border the river, entered the plaintiff bank through the back door, and passing through a sort of store-room to the directors' room or private office back of the main office, and in the presence of McKinney, emptied on the table the contents of the box, saying: "I have brought you the deposit," or "Here it is." McKinney and Hollister began counting the deposit of $27,236.63, and after the money was counted, the cashier, at the suggestion of Bailey, made out a deposit book in the name of "H. L. Hollister, C. G. Coats, and W. H. Corson, bondsmen," and credited them with the amount of the funds. McKinney knew at this time that these were the county funds, and that the depositors were the treasurer's sureties, in charge of his office and funds while he was getting an additional bond.

The cheque was not endorsed by the bondsmen, and they had no account at that bank. Hollister endorsed several other cheques making up the deposit, but was not asked to endorse this one. Bailey then said to McKinney, "That is a pretty good size cheque; you had better go and get your money on it." McKinney said that he would collect it or see that their doors did not open the next morning. Twice that afternoon plaintiff presented the cheque to the First National Bank for payment, which was refused upon the ground that plaintiff had no right to the cheque, and that it was given without consideration. In the evening a conference was held at the plaintiff bank between its officers and attorney, and those of the First National Bank, at which the plaintiff was again notified that the cheque was without consideration, and had been fraudulently diverted from the purpose for which it was issued, and was urged to charge the same back to the bondsmen. This the plaintiff bank refused to do, the plaintiff's cashier remarking that if the bank did not pay it they knew a way to make it.

The next morning, January 14, the plaintiff commenced this action. On January 18, the board of county commissioners, having found the treasurer's account correct, by resolution approved the same, and thereupon Howard tendered his resignation as treasurer, and C. L. Norton, cashier of the plaintiff bank, was appointed his successor. On the next day, January 19, by further resolution of said board, the bondsmen were required to turn over to the county commissioners all the evidences of deposit and all funds belonging to the county, and thereupon the cheque of the bondsmen in the sum of $27,236.63, certified by McKinney, president of the plaintiff bank, was accepted by the county commissioners in full discharge of the bondsmen for the funds received of the county January 13, and Norton as county treasurer receipted to the commissioners for that sum of money in currency. Prior to taking possession of Howard's funds and the cheque in suit by the county commissioners, there was evidence tending to show that the board was notified by one Wilkes not to take the cheque under consideration; that the payment of the cheque would be resisted. This testimony was disputed.

The case was removed for trial to Moody County, and the court, upon motion of the plaintiff at the close of the defendants' testimony, directed a verdict for the amount of the cheque, upon which judgment was rendered by the District Court for $18,417.24. The case was appealed to the Supreme Court of the Territory, where the judgment below was affirmed, and the defendant sued out a writ of error from this court.

*Mr. Thomas B. McMartin* for plaintiffs in error.

*Mr. William A. Wilkes, Mr. F. L. Boyce,* and *Mr. R. J. Wells* filed a brief for the First National Bank of Sioux Falls, plaintiff in error.

*Mr. George A. Madill* and *Mr. Cushman K. Davis* for defendant in error.

The District Court did not err in directing a verdict and in entering judgment for the plaintiff.

The instrument issued on January 12, 1886, by the First National Bank (plaintiff in error), payable "to the order of C. K. Howard, Co. treasurer," for the sum of $16,571.61, was a cashier's cheque. It is idle to discuss what other instrument known to the law merchant is similar to it or has some element in common with it. The fact is that it is a form of instrument in general use in the business of the country. It is issued by banks because of its convenience, and has been assigned and occupies a prominent and permanent place in commercial transactions because of its negotiability, after endorsement in blank by the payee, by mere delivery and because the confidence in it is coextensive with the character and responsibility of the bank issuing it. This cheque was made by the bank to Howard for the express and understood purpose of enabling him to make his settlement with the Board of County Commissioners. The plaintiffs in error are estopped from setting up any secret understanding as to it, had between Howard and the officers of the bank, contrary to the legal effect of the cheque itself and to the admitted purpose for which it was given.

The cheque was regular upon its face. It was presented by Howard to the board as it was by the bank intended to be in settlement of his accounts. Howard endorsed it and the board took it in satisfaction. This exonerated the sureties from all liability up to and including that settlement.

The power of a national bank to issue such a cheque to its customer is as clear as its power to certify the cheque of such customer, and the power to do the latter has long been recognized and sanctioned by the courts. *Espy* v. *Bank of Cincinnati*, 18 Wall. 604, 620; *Merchants' Bank* v. *State Bank*, 10 Wall. 604; *First National Bank of Washington* v. *Whitman*, 94 U. S. 343; *Bull* v. *Bank of Kasson*, 123 U. S. 105. Nor can the authority of the cashier of a national bank to issue a cashier's cheque be questioned by the bank in a suit against it upon such cheque.

Nor can the bank be permitted in such suit to urge, as a defence, that the amount for which the cheque was issued exceeded a tenth part of the amount of the capital stock of the bank actually paid in by the stockholders. *Wyman* v. *Citizens' National Bank of Faribault*, 29 Fed. Rep. 734; *Gold Mining Co.* v. *National Bank*, 96 U. S. 640; *National Bank* v. *Matthews*, 98 U. S. 621; *National Bank* v. *Whitney*, 103 U. S. 99; *National Bank* v. *Graham*, 100 U. S. 699.

MR. JUSTICE BROWN, after stating the case, delivered the opinion of the court.

As the cheque in this case is admitted to have been obtained without consideration, and to have been invalid in the hands of the immediate payee, the plaintiff, to sustain its own title, must prove either that it was itself a *bona fide* holder without notice, or that the county commissioners, of whom it received the paper, had taken the same for value without notice of any defect in its inception. *Lytle* v. *Lansing*, 147 U. S. 59.

The circumstances under which the cheque was issued were a plain fraud upon the law and also upon the county commissioners. It seems that Howard kept his deposit as county treasurer with the defendant bank, and had been personally

interested with it in different enterprises. He says that, a few days before his semi-annual settlement, he had a talk with Mr. Wells, president of the bank, in which the latter agreed to assist him in this settlement. He told them that it would take about $15,000 to make the settlement. He proposed to the cashier to give him a note for the amount, but the cashier told him it would be better to make some drafts to cover that amount of credit. He thereupon made three drafts, aggregating $15,000, upon M. D. Steevers & Co. of Chicago, who had before this honored his drafts, at the same time telling the cashier that he had not the proper credit to obtain payment of them. The bank thereupon gave him a deposit book showing a balance of $15,625.01 on deposit. This the board refused to accept, and demanded a certified cheque, which the bank refused to give, but gave the cashier's cheque in suit.

At the time this cheque was issued, the bank had a capital stock of $50,000, and if this cheque be regarded as a loan, as it must be, it was in express violation of Revised Statutes, § 5200, which provides that "the total liabilities to any association, of any person, or of any company, corporation, or firm, for money borrowed, including, in the liabilities of a company or firm, the liabilities of the several members thereof, shall at no time exceed one-tenth part of the amount of capital stock of such association actually paid in."

The substance of the transaction was, that the bank, with knowledge that Howard had not funds of the county sufficient to balance his accounts as treasurer, — in short, that he was a defaulter, — consented to give him a fictitious credit, in order to enable him to impose upon the county commissioners. But the vital question is, whether the commissioners received this cheque in the ordinary course of business, believing it to represent an actual debt of the bank to Howard as county treasurer to the amount of the cheque. To recover upon paper which has been diverted from its original destination and fraudulently put in circulation, the holder must show that he received it in good faith, in the ordinary course of business, and paid for it a valuable consideration. *Wardell* v. *Howell*, 9 Wend. 170; *Farmers' & Citizens' Bank* v. *Noxon*, 45 N. Y. 762.

By the Compiled Laws of Dakota, § 4487, "an indorsee in due course" is defined as "one who in good faith, in the ordinary course of business, and for value, before its apparent maturity or presumptive dishonor, and without knowledge of its actual dishonor, acquires a negotiable instrument duly indorsed to him, or indorsed generally, or payable to the bearer." And by § 4739, "good faith consists in an honest intention to abstain from taking any unconscientious advantage of another, even through the forms or technicalities of law, together with an absence of all information or belief of facts which would render the transaction unconscientious." Applying the law thus stated to the facts of this case, it appeared that before the cheque was presented, the county commissioners had refused to receive a deposit book, as well as a written statement of the bank that Howard had a credit to the amount of $15,625.01 upon the books of the bank as a part of his official assets, and demanded either the money or a certified cheque, as they doubtless had a right to do. Indeed, it is doubtful whether the commissioners had a right to recognize anything but current money in the settlement of the treasurer's accounts. By the Compiled Laws of Dakota, § 1598, territorial warrants are receivable for general territorial taxes, county warrants for county taxes, city warrants for city taxes, school warrants for school taxes, "but United States Treasury notes or their equivalent only are receivable for such taxes as are or may be required by law to be paid in cash." And by § 1656 : "If any county treasurer shall fail to make return, fail to make settlement, or fail to pay over all money with which he may stand charged, at the time and in the manner prescribed by law, it shall be the duty of the county clerk, on receiving instructions for that purpose from the territorial auditor, or from the county commissioners of his county, to cause suit to be instituted against such treasurer and his sureties," etc.

Now, if the county treasurer had no authority to receive anything but coin, Treasury notes, national bank notes, or other current money, it is difficult to see what authority the county commissioners had to accept anything less in the set-

tlement of his accounts. If they have the authority to accept cheques and other evidences of debt, where does that authority cease? May they not also receive notes, drafts, bonds, or other obligations which in their opinion may then or thereafter be good? As was said in *Cawley* v. *People*, 95 Illinois, 249, 256, speaking of the duty of auditing boards: "They are limited and controlled in their official acts, and they are not, unless authorized, empowered to do or not to do official acts. In this class of cases they are empowered, and it is enjoined on the board, to require sufficient bond from the treasurer and to approve it. They have no power to dispense with the duty, nor can they, without a proper consideration, release sureties from their obligations under the bond. If they were to do so, in fraud of the rights of the people, the act would have no binding effect and would be void. . . . . There can be no question that the treasurer could only discharge himself for county funds in his hands by paying to the county, in money, county orders or jury warrants. The statute requires him to pay in such funds. It is not intended that he may pay in promissory notes, cheques, drafts, and other paper." Indeed, it is doubtful whether the county commissioners who, under the laws of Dakota, are simply an auditing body, had any authority to receive moneys of the county from the treasurer, for which they gave no bonds, and whether their act in taking possession of his assets, including this cheque, was not beyond the scope of their authority. They did, however, receive the money and the cheque, and at the same time, and as a part of the same transaction, turned them over to the sureties upon his bond, although they did not at that time, or until six days thereafter, pass his accounts or release his sureties. What warrant they had for turning over these securities to the bondsmen does not appear, but there was evidently no intention on their part of releasing the sureties, nor was the county placed in any worse position by that act. If the commissioners had received this cheque believing it to have been issued in good faith and retained it, it is possible the county might have stood in the position of an innocent purchaser. But their receipt of it and their turning it over to the sureties

was evidently a single act, and intended to assist the sureties in protecting themselves. It was wholly inconsistent with the idea of releasing them from their obligation.

Aside from the somewhat suspicious circumstances attending the sudden production of a cheque of this large amount, which could scarcely be said to be in the ordinary course of business, there was evidence tending to show that about the time of the receipt of the cheque, on January 12, Mr. Wright, the county attorney, was informed by the counsel of the bank that the board should not take the cheque into consideration; that the bank would defend against it, as in the hands of Howard, and refuse payment; and that the next day, when the board was in session, a similar notice was given to them. It is true that some of this testimony, with regard to the notice, is disputed; but in determining whether the case should have been left to the jury, or not, we are to consider only the uncontradicted facts. Beyond this, however, there is some testimony tending to show that the cheque was not delivered by Howard voluntarily, as such delivery involved a plain violation of the condition upon which he had received it; but was extorted by the bondsmen and commissioners under a show of force. If this be true, it was clearly not a receipt of the cheque in the ordinary course of business. Be this as it may, it does not appear that the county commissioners took any action prejudicial to their rights against the county treasurer and his sureties until the 18th, when his settlement was approved, and on the 19th the cheque of the bondsmen, certified by the president of the plaintiff bank, was received in full discharge of such bondsmen.

Without expressing an opinion of our own whether the evidence did or did not establish the fact that the county was an innocent holder for value of this cheque, we are clear that the testimony upon this point should have been submitted to the jury.

There was certainly evidence enough to go to the jury that the plaintiff bank as well as the sureties upon the bond received the paper with notice that its collection would be resisted. The sureties received the paper simply as bailee for

the county. They paid no consideration for it. It simply passed through their hands to the plaintiff bank, which consented to receive it on deposit and to credit them with the amount.

With regard to the possession of the plaintiff bank, the evident anxiety of McKinney, its president, to obtain for it the treasurer's deposit; his inquiry whether it was a straight cashier's cheque; his threat that the bank should pay it or close its doors; the substitution of Norton, the cashier of this bank, for Howard as county treasurer; the suspicious manner in which the money was brought to the bank; the prompt commencement of the action against the defendant on the morning after the cheque was refused; the conversation on the following morning, the 15th, between the assistant cashier of the plaintiff bank and the editor of a local paper, in which the former said: "The Sioux Falls National Bank had done a great deal for me, and now was the time for me to stand by them; it was a matter of vital importance to them;" were all suspicious circumstances tending to throw grave doubt upon the claim of the plaintiff bank to be a *bona fide* holder of the paper. Add to this the fact that twice during the afternoon of the 13th the plaintiff bank presented the cheque for payment, which was refused upon the ground that it was given without consideration, and had been fraudulently diverted from the purpose for which it was issued; that this notice was repeated at a conference between the officers of the two banks the same evening, and the plaintiff bank requested to charge it back to the bondsmen, and it is too clear for argument that the plaintiff did not itself stand in the position of an innocent holder. Bad as the conduct of the defendant bank was in issuing the cheque, the testimony is calculated to engender a strong suspicion that the motive of the plaintiff bank in receiving it was to secure to itself the deposit of the county moneys, and perhaps also to crush out a rival institution.

While it is true the plaintiff bank credited the bondsmen with the amount of the cheque on its receipt, it parted with nothing upon the faith of it until nearly a week thereafter.

If it had cancelled the chequé on the evening of the 13th, as it was requested to do, it would have done no more than the law required of it. The mere credit of a cheque upon the books of a bank, which may be cancelled at any time, does not make the bank a *bona fide* purchaser for value. If after such credit and before payment for value upon the faith thereof, the holder receives notice of the invalidity of the cheque, he cannot become a *bona fide* holder by subsequent payment. *Dresser* v. *Missouri &c. Construction Co.*, 93· U. S. 92; *Mann* v. *Second Nat. Bank*, 30 Kansas, 412; *Central Nat. Bank* v. *Valentine*, 18 Hun, 417; *Manf. Nat. Bank* v. *Newell*, 71 Wisconsin, 309; *Buller* v. *Harrison*, Cowp. 565.

The claim that defendant was estopped by its cheque to deny that the bank was indebted to the county in the amount of such cheque, depends practically upon the same considerations as the question of innocent purchaser. If, upon the faith of such representations, the county commissioners did any act prejudicial to the interests of the county, an estoppel might arise; but if, before such act was done, the commissioners were informed that the cheque was fictitious, they could not be said to have acted upon the faith of its representation, and there could be no .estoppel. Even if such estoppel had arisen in favor of the county, it is, at least, doubtful whether the plaintiff bank could avail itself of it. *Deery* v. *Cray*, 5 Wall. 795; *Mayenborg* v. *Haynes*, 50 N. Y. 675.

We have not deemed it necessary to consider whether this cheque falls within the class upon which we have held that no action will lie in favor of the holder against the drawee before acceptance. *Bank· of Republic* v. *Millard*, 10 .Wall. 152; *First Nat. Bank of Washington* v. *Whitman*, 94 U. S. 343; *Bull* v. *Bank of Kasson*, 123 N. Y. 105.

In any view we have been able to take of this' case, we think the question of plaintiff's title to this cheque and its right to recover upon the same should have been left to the jury under proper instructions.

*The judgment of the court below is, therefore, reversed, and the case remanded to the Supreme Court of the State of*

*South Dakota with instructions to remand the case to the proper court of Moody County, and to direct the verdict and judgment to be set aside and a new trial granted.*

Mr. Justice Brewer dissented.