NATIONAL BANK OF COMMERCE, APPELLANT, V. ERNEST BOSSEMEYER ET AL., APPELLEES.

FILED APRIL 14, 1917. No. 19061.

1. **Bills and Notes: INDORSEMENT.** Under the provisions of section 5354, Rev. St. 1913, an indorsement "Pay to any bank or banker. All previous indorsements guaranteed"—is not a retrictive indorsement.

2. ———: ———: HOLDER FOR VALUE. In the usual course of business a grain dealer deposited in a bank a sight draft with bill of lading attached, in which the depository bank was payee. It forwarded the draft to plaintiff, its correspondent bank, indorsed generally as above. Plaintiff bank gave credit to the remitting bank for the amount in its general checking account. The custom between the banks was that, if such drafts were protested and returned to plaintiff, they should be charged back to the account of the

remitting bank, and that interest should be charged from the time the credit was given until the proceeds of the draft were received. Plaintiff had no knowledge or notice of any custom between the depositor and the remitting bank, and there is no other evidence as to the intention of the parties. *Held*, that the indorsement and credit passed title to the draft to the receiving bank and made it a holder for value in due course.

3. ———: LIABILITY OF DRAWER. The draft was protested for nonpayment and returned. *Held*, that the receiving bank was entitled to enforce payment of the draft and protest fees against the drawer. Section 5379, Rev. St. 1913.

APPEAL from the district court for Nuckolls county: LESLIE G. HURD, JUDGE. *Reversed, with directions.*

*Morning & Ledwith, E. J. Hainer* and *A. W. Lane,* for appellant.

*Buck, Brubaker & Buck, contra.*

LETTON, J.

On January 3, 1911, defendants, who are grain dealers at Superior, Nebraska, drew a sight draft upon a firm in New Mexico for $729 and attached a bill of lading for a car of grain consigned to the order of the drawer. They deposited the draft in the First National Bank of Superior (hereafter termed "the Superior bank"), which gave them credit for the amount upon their checking account. This was done in accordance with a custom whereby defendants deposited such drafts with bills of lading attached and were given credit, with the understanding that, if the draft was not paid, it should be protested, and its amount, with protest fees, should be charged back; that, if interest was charged to the bank by the correspondent, the interest should be charged to the account of drawer. Before the draft was deposited, by mutual agreement the custom was changed and such dishonored drafts were not charged back, but defendants, upon being notified of their return, would give a check to the bank to cover the amount of the draft and protest fees. This was the custom in Superior between banks and grain dealers generally.

101 Neb.—7

The Superior bank sent the draft and bill of lading to plaintiff, its correspondent bank in Lincoln, which credited it with the amount and forwarded the draft and bill of lading to New Mexico through its regular correspondents. The draft bore upon its face the following: "Protest and return immediately with all papers attached if not paid upon presentation." The indorsement by the Superior bank is as follows: "Pay any bank or banker. All previous indorsements guaranteed." Before the draft reached New Mexico the Superior bank had suspended payments and been taken in charge by the comptroller of currency. Defendants notified the drawee not to pay the draft, caused the car to be delivered, and collected the amount due from him. The draft was protested and returned to plaintiff. This action was brought against the drawers by plaintiff as a holder for value, as defined in section 5344, Rev. St. 1913. Five similar transactions are alleged as causes of action in the petition.

Several defenses are set up: (1) That the drafts were deposited with the Superior bank for collection only, to the knowledge of plaintiff, and were received by plaintiff from that bank for collection. (2) That, since the Superior bank charged interest until the collection was made and charged the drafts back if not paid, it was not an owner or holder in due course, and the same relation as to the drafts being deposited for collection existed between the Superior bank and plaintiff. (3) That at the time the drafts were received the Superior bank was insolvent, which was known to plaintiff and to the officers of the Superior bank, but unknown to defendants, and that when these conditions became known defendants rescinded the transaction. The action was tried to the court without a jury, which found generally for the defendants and rendered judgment of dismissal. Plaintiff appeals.

The evidence is undisputed that the Superior bank had only one account with plaintiff; that as soon as such drafts were received by plaintiff it gave credit to the Superior bank for the amount of the same and usually charged

interest from that time until it received the proceeds from
its correspondent bank; that if any draft was protested
and returned it charged back the amount of the draft and
protest fees to the Superior bank, and that this is the usual
custom among bankers. Plaintiff had no notice of the in-
solvency of the Superior bank until January 9, 1914, and
had no knowledge of the dealing between the drawer and
the Superior bank, but received these drafts in the usual
course of business, relying upon the indorsements. The
assistant cashier of the plaintiff bank testifies that the
drafts were sent to plaintiff, together with checks on Lin-
coln and other banks, foreign bills of exchange, and other
items, with deposit slip "Enclosed for credit and advice,"
and were acknowledged in the following form:

NATIONAL BANK OF COMMERCE.

As per your letter of 3:

| We credit subject to payment | We transfer to | We enter for collection |
|---|---|---|
| 634  2    43<br>36  3    28 | New York<br>Chicago | |

Items merely sent for collection were entered under the
column "We enter for collection." When plaintiff received
notice of the failure there was a credit of $3,608.36 on its
books to the credit of the Superior bank. This amount
fluctuated until March 28, when there was $4,102.52 on
hand, which was the amount at the time of the trial. The
plaintiff bank had also loaned to the Superior bank $10,-
000 upon its note, which was secured by collateral to the
amount of $14,000; $1,000 of which has been collected and
the remainder is of questionable value. The drawer testi-
fied that the drafts were deposited with the Superior bank
for collection only. The question for determination is
whether the draft was received by the plaintiff for collec-
tion, the title and ownership remaining in the Superior
bank, or, did plaintiff become a holder in due course by the
indorsement and receipt of the draft and the crediting of

the Superior bank with the amount thereof? Defendants contend that the indorsement is restrictive and shows that the title did not pass; that, since the custom was that interest should be charged between the date of the receipt of the paper and the receipt of the money in payment thereof, and because if not paid it was the custom to charge the amount and protest fees back to the account of the Superior bank, the draft was taken for collection only.

Is the indorsement restrictive? Whatever may have been held before the enactment of the negotiable instruments act, it is clear that this question must be determined by the provisions of that statute. Section 5354, Rev. St. 1913, is as follows: "An indorsement is restrictive which either: First—prohibits the further negotiation of the instrument; or, second—constitutes the indorsee the agent of the indorser; or, third—vests the title in the indorsee in trust for or to the use of some other person. But the mere absence of words implying power to negotiate does not make an indorsement restrictive."

There is nothing on the face of this indorsement which prohibits the further negotiation of the instrument or constitutes the indorsee the agent of the indorser, or vests title in the indorsee in trust for the use of some other person, and hence, by the most elementary principles of statutory construction, the plain meaning of the language must be observed, and it must be held that the indorsement was not restrictive.

In *Bank of Indian Territory v. First Nat. Bank,* 109 Mo. App. 665, a case which was decided before the negotiable instruments act went into effect in that state, it was held, without any discussion of the reasons, that an indorsement such as this was a restrictive indorsement. In three cases decided in that state after the act was in force (*National Bank of Rolla v. First Nat. Bank,* 141 Mo. App. 719; *National Bank of Commerce v. Mechanics American Nat Bank,* 148 Mo. App. 1; *Citizens Trust Co. v. Ward,* 195 Mo. App. 223) the same ruling was made; but in none of these cases was the language of the statute con-

sidered, and the holding is placed upon the authority of the first case, which, as we have seen, was decided before the act took effect. These cases are not authority upon the proposition as to whether such an indorsement is restrictive under the provisions of the act. Furthermore, any bank receiving a draft with such an indorsement has the right to again indorse it in blank or payable to any particular bank or person. This, of course, it would have no power to do if the indorsement was restrictive. If, however, the words "for credit," "for account," "for collection and return," had been added, the character of the indorsement would have been changed entirely, and it would have been restrictive, showing upon its face that the indorsee bank took it only as a collecting agent, and not as a holder for value. *White v. Miners Nat. Bank,* 102 U. S. 658; *Commercial Bank of Pennsylvania v. Armstrong,* 148 U. S. 50; *Ditch & Bros. v. Western Nat. Bank,* 79 Md. 192, 23 L. R. A. 164; *Murchison Nat. Bank v. Dunn Oil Mills Co.,* 150 N. Car. 718; *Fayette Nat. Bank v. Summers,* 105 Va. 689, 7 L. R. A. n. s. 694; *United States Nat. Bank v. Geer,* 55 Neb. 462.

In *First Nat. Bank of Belmont v. First Nat. Bank of Barnesville,* 58 Ohio St. 207, 41 L. R. A. 584, it is pointed out that the practice of indorsing checks "for collection," "for account,"had become almost universal, but when it was decided by the supreme courts of New York and Missouri that the drawee bank could not recover back money paid upon a forged draft in the one case from a collecting bank, or in the other from the bank owning the draft, "it startled the banks located in large cities, and awakened them to the dangers attending the payment of such drafts or bills, and the result was that in the year 1896 the clearing house in the city of New York adopted a rule to the effect that its members should not send through the exchanges any paper having any qualified or restrictive indorsements, such as 'for collection,' or 'for account of,' unless all indorsements were guaranteed by the bank sending such paper. This action was soon followed by the clearing houses in other

cities, and in some of them all indorsements are required to be either in blank, or 'pay to......or order.' By this action of the clearing houses, indorsements 'for collection,' or 'for account of,' have fallen into disuse, and the banking business of the country is now done, almost universally, upon unrestricted indorsements." We conclude, then, that the indorsement by the Superior bank was general, and not restrictive.

Does the fact that, if protested, the Lincoln bank was entitled to charge back the amount of the draft and protest fees constitute it merely an agent for collection and not a holder in due course? While there is some conflict in the authorities, the better view is that the deposit of a check or draft in a bank with a general indorsement and the giving of credit for its amount by the bank to the depositor, in the absence of other evidence as to the intention of the parties, passes the title to the bank and makes it a holder for value, entitled to recourse on prior indorsers upon the protest of the paper. In other words, when such a state of facts is proved there is a *prima facie* case made that the title has passed, and the fact that it, the receiving bank, may charge back a protested draft does not affect the relation. In *Higgins v. Hayden,* 53 Neb. 61, before the enactment of the negotiable instruments act, it was held that a bill of exchange drawn to the order of a bank by its customer, the amount of which was placed to his credit, and on which he drew and the bank paid checks, became the property of the bank; such conduct being inconsistent with the theory of a bailment for collection. 2 Michie, Banks, sec. 127; 1 Morse, Banks and Banking, sec. 187; 2 Morse, Banks and Banking, secs. 573, 575; *National Bank v. Everett,* 136 Ga. 372; *Dymock v. Midland Nat. Bank,* 67 Mo. App. 97; *Brusegaard v. Ueland,* 72 Minn. 283; *Jefferson Bank v. Merchants Refrigerator Co.,* 236 Mo. 407, 415; *Ditch & Bros. v. Western Nat. Bank,* 79 Md. 192, 23 L. R. A. 164; *Burton v. United States,* 196 U. S. 283; 25 Sup. Ct. Rep. 243, and cases cited; *Noble v. Doughten,* 72 Kan. 336, 3 L. R. A. n. s. 1167; *Bank of the Metropolis v. New*

*England Bank,* 1 How. (U. S.) 234; *Fayette Nat. Bank v. Summers,* 105 Va. 689, 7 L. R. A. n. s. 694; also cases cited in 7 C. J. p. 635, note 27, p. 599, note 43.

That credit to the drawer was entered by the Superior bank in a passbook in which was printed, "This bank in receiving out of town checks and other collections acts only as your agent and does not assume any responsibility beyond due diligence on its part," cannot affect the right of the plaintiff to recover in this case. The fact that the drawers put the paper in circulation, and that the Superior bank was thus able to negotiate it as its owner and holder, received full credit for it, the plaintiff bank having no knowledge of any infirmity, makes it a holder for value as defined in section 5344, Rev. St. 1913.

The Minnesota case, *In re State Bank,* 56 Minn. 119, is not in conflict with these views, since in that case the controversy was between the original parties, and not between a holder for value without notice, and the drawer, and such was the relation between the parties in the other cases cited in which a printed notice was on the passbook. A similar case is *South Park Foundry & Machine Co. v. Chicago G. W. R. Co.,* 75 Minn. 186.

The fact that a custom between banks and grain dealers is that, when any draft bearing a general indorsement was unpaid, it was protested and either charged back or paid by the drawer is an argument in favor of the plaintiff's position, and not in favor of the defendants, because such a custom clearly recognizes the liability of the drawer to pay a dishonored draft to the indorsee who has failed to collect the same. Even though by the custom between the drawer and the Superior bank the drafts were taken only for collection, there is absolutely no proof in the record that the plaintiff had any knowledge whatever of this state of affairs. It received the draft with the general indorsement and credited the Superior bank with the amount in its deposit account which was drawn upon from day to day. Under section 5379, Rev. St. 1913: "The drawer by drawing the instrument admits the existence of the payee

and his then capacity to indorse, and engages that on due presentment the instrument will be accepted or paid, or both, according to its tenor, and that if it be dishonored, and the necessary proceedings on dishonor be duly taken, he will pay the amount thereof to the holder, or to any subsequent indorser who may be compelled to pay it. But the drawer may insert in the instrument an express stipulation negativing or limiting his own liability to the holder." The benefit of this liability in case of dishonor was transferred to plaintiff by the general indorsement. When the Superior bank closed its doors its assets became the property of the receiver for the purpose of liquidating its affairs. The rights of its receiver against the plaintiff or plaintiff's right to apply the fund in its hands to the payment of the debt of the Superior bank are not involved in this case, since the receiver is not a party to the suit, and the case must be determined without regard to this fund. That the bank was in fact insolvent at the time of the deposit, under the circumstances of this case, does not seem to be material: First, because plaintiff bank took the draft in good faith for value without notice or knowledge of any infirmity in the title; and, second, because the drawers between the time of the deposit of the first drafts and the closing of the bank drew out over $4,000 more than the credit given, and within a few hundred dollars of the total amount deposited within this period, leaving the account of the drawers substantially as it was before the drafts were deposited.

Under the provisions of the negotiable instruments act and the evidence in the case the defendants are liable as drawers for the full amount of the drafts and protest fees. The judgment of the district court is reversed and the cause remanded, with directions to enter judgment for the amount due.

REVERSED.

ROSE, J., took no part in the decision.

HAMER, J., dissenting.

I am unable to agree with the views expressed in the majority opinion. As I understand the facts in the case the defendants, the Bossemeyers, were dealers in grain at Superior. They were accustomed to draw sight drafts on the person to whom they shipped grain. The draft was expected to cover the full amount of the shipment, and it was expected that it would be paid out of the proceeds of the grain when it reached its destination. A draft would be drawn upon the person who was expected to receive the grain and for the price of the grain. There would be attached to that particular draft a bill of lading for the grain shipped. We will take one of the drafts and copy it with the indorsements upon it, and also the bill of lading attached to it, with its indorsements:

"Bossemeyer Bros., Grain Dealers.  No. 1809.
"Superior, Neb., Jan. 3, 1914.
"At sight, pay to the order of First National Bank $729, seven hundred twenty-nine and 00/100 dollars.
"Bossemeyer Bros.,            By P. Bossemeyer.
"Young & Wheeler, Magdalena, N. Mex.
"Protest and return immediately with all papers attached if not paid upon presentation."

Indorsed on back: "Pay any bank or banker.  All previous indorsements guaranteed.  76-137.  Jan. 3, 1914. 76-137.  First National Bank, Superior, Nebraska.

"Pay to the order of any bank or banker for collection and remittance.  Jan. 5, 1914.  National Bank of Commerce.  43-3 Lincoln, Nebrasaka.  43-3.  James A. Cline, Cashier.

"Mechanics American National Bank, St. Louis, Mo. Pay to order of any bank or banker.  Prior indorsements guaranteed.  Jan. 6, 1914.  J. S. Calfee, Cashier.  (In red ink)  Indorsement erased.

"Pay to the order of any bank or banker.  Prior indorsements guaranteed.  Jan. 7, 1914.  Drovers National Bank. 18-22 Kansas City, Mo.  18-22."

As the bill of lading is very long we will copy only such parts of it as seem material:'

"The Atchison, Topeka & Santa Fe Railway Company "Order Bill of Lading—Original.          Shipper's No. 1809.

"Received, subject to the classifications and tariffs in effect on the date of issue of this original bill of lading, at Superior, Neb., Jan. 3, 1914, from Bossemeyer Bros., the property described below, in apparent good order, except as noted. * * *

"The surrender of this original order bill of lading properly indorsed shall be required before the delivery of the property. Inspection of property covered by this bill of lading will not be permitted unless provided by law or unless permission is indorsed on this original bill of lading or given in writing by the shipper." Indorsed across above paragraph in red ink is the following: "A. T. & S. F. Ry. Co. Received Jan. 3, 1914. Freight Office. Superior, Nebr. * * *

"Consigned to order of Bossemeyer Bros. Destination, Magdalena, State of N. Mex., County of ———. Notify Young & Wheeler at Magdalena, State of N. Mex., County of ———. Route ———. Car Initial, A. T. & S. F. Car No. 27601.

| No. Packages | Description of Articles and Special Marks. | Weight Subject to Correction | Class or Rate | Check Column. |
|---|---|---|---|---|
| 400 100 | Sax Corn Sax Cracked Corn 50 m car ordered | 40000 10000 ⎯⎯⎯⎯ 50000 | | |

"Bossemeyer Bros., Shipper, Per H.

G. W. Hall, Agent,
By H. O. E.

"(This bill of lading is to be signed by the shipper and agent of the carrier issuing same.)"

The drafts appear to have been drawn and attached to bills of lading so as to enable the collection of certain amounts due for grain that had been shipped to customers

of the Bossemeyers. It was the custom of the First National Bank of Superior to send the draft and bill of lading to their correspondent. At the time the draft and bill of lading were received there would be a credit given to the Bossemeyer Brothers by the First National Bank of Superior, and, if there was a failure to collect, the amount would be charged back and the credit of Bossemeyer Brothers reduced accordingly. This sort of business had been conducted by the Bossemeyers with the First National Bank of Superior for perhaps 25 or 30 years. There were five of these drafts each with its bill of lading attached. The shipments were made to various places in other states than Nebraska. The places were of course mentioned in the bills of lading, as also the person expected to pay named in each.

The National Bank of Commerce of Lincoln, Nebraska, brought this action against the defendants, the Bossemeyers, as makers of five sight drafts aggregating about $3,200. The case was brought in the district court for Nuckolls county, and was tried before the judge of that court; a jury being waived. It was the contention of the defeated plaintiff that the sight drafts were negotiable, and that the defendants, the Bossemeyers, having made them, were liable thereon.

The defendants interposed defenses: (1) That the plaintiff was not the owner of the drafts; (2) that the drafts were deposited for collection only; (3) that the plaintiff did not intend to purchase the drafts; (4) that each draft and the bill of lading attached thereto were inseparable, and that the drafts represented perishable goods and could not be purchased by the bank, even if it wished to purchase the same; (5) that the plaintiff bank did not pay for the drafts; (6) that any credit given to the First National Bank of Superior was not drawn out; (7) that sight drafts with bills of lading attached are not covered by the negotiable instruments law, and that these drafts with the bills of lading attached showed that the defendants were not liable as drawers of commercial paper; (8)

that the drafts were taken by the First National Bank of Superior for collection and were not purchased by it, but were taken by it to be transmitted to the plaintiff bank for collection; (9) that drafts and bills of lading were received by the First National Bank of Superior at a time when it was insolvent.

An examination of the testimony convinces the writer that the contention made by the defendants is correct. It appears to me that the five sight drafts with their respective bills of lading attached are not in any sense negotiable instruments, and were not intended to circulate as commercial paper subject to the provisions of the negotiable instruments law, but that the scheme was devised for the collection of the amounts due on said shipments of grain shown by the bills of lading. The drafts and bills of lading were received from the 3d to the 7th of January, 1914, and on the next day, January 8, 1914, the bank failed and quit doing business. The reply of plaintiff admits that, "accompanying each of said several sight drafts, there was a bill of lading covering in each case one carload of grain shipped by the defendants to their own order, said several bills of lading being substantially the same as the said copies attached to said amended answer, excepting that each bore the indorsement of Bossemeyer Brothers upon the back thereof as follows: 'Bossemeyer Bros.'"

There is no statement in the reply that the deposit of the First National Bank of Superior with the plaintiff bank was exhausted, or that this money contained in the drafts, and for which in the first place the First National Bank of Superior was given credit by the plaintiff bank, was drawn out by the First National Bank of Superior; neither is there any allegation in the reply of the plaintiff bank or in its petition that it paid anything for the drafts and bills of lading; and an examination of the evidence shows that the plaintiff bank never paid anything for the drafts. The statement contained in the syllabus of the majority opinion that "all previous indorsements guaranteed" is not a "restrictive indorsement" is not sustained in the face of the

evidence which clearly shows that the indorsement was only to enable the collection of the price of the grain contained in the bill of lading.

Neither am I able to find any evidence which satisfactorily establishes to my mind that title to the drafts passed "to the receiving bank and made it a holder for value in due course." The evidence shows beyond all controversy that the receiving bank did not pay even one dollar for the drafts. I have never seen a case that seemed to me to have less to sustain it than this one. If the rule sought to be established and maintained in this case is finally declared and fixed, then no country bank can send a collection to a city bank in this state without running the greatest risk of having it appropriated by the city bank without any consideration therefor, and in the face of the evidence and the uncontroverted facts. Such appropriation would be regardless of all the rights of the customers of the country bank. In this case there was no controversy between the First National Bank of Superior and the Bossemeyer Brothers. The only controversy is with the National Bank of Commerce, which up to this date seems to have successfully appropriated the grain shipped by the Bossemeyers. While not the grain itself, the judgment amounts to the price thereof.

According to Bossemeyer's testimony Weil did not claim that his bank had suffered in any way. The jury in this case was waived and the case was tried to the district judge sitting as the district court. His finding is like the finding of a jury. I do not see what business we have to set it aside.

In *Whisker v. Vera Cruz Coffee Co.*, 95 Neb. 119, this court held: "The finding in an action at law, tried by the district court without the intervention of a jury, is entitled to the same consideration as the verdict of a jury, and will not be set aside unless it appears to be clearly wrong."

"The findings of the district court in a law action tried to the court without the intervention of a jury are entitled

to the same weight as the verdict of a jury, and will not be disturbed unless the evidence is clearly insufficient to sup: port them." *Stanisics v. Hartford Fire Ins. Co.*, 83 Neb. 768.

"A finding of fact made by a court in the trial of an action at law is entitled to as much respect as the verdict of a jury, and, if there is competent evidence to support the finding, it will not be disturbed on appeal." *Dorsey v. Wellman*, 85 Neb. 262.

Where an action at law is tried in district court without a jury, findings of fact have the same force as a verdict. *National Engraving Co. v. Queen City Laundry*, 92 Neb. 402; *Darr & Spencer v. Kansas City Hay Co.*, 85 Neb. 665; *Providence Jewelry Co. v. Gray Mercantile Co.*, 92 Neb. 633.

On the first page of the Bossemeyers' pass book there was the following: "First National Bank, Superior, Nebraska. In account with Bossemeyer Bros., Superior, Nebraska. This bank in receiving out of town checks and other collections, acts only as your agent and does not assume any responsibility beyond due diligence on its part, the same as on its own paper." No one makes the contention that the First National Bank of Superior became the owner of these drafts and bills of lading. If it did not, then how did the plaintiff bank become the owner of the same? As the First National Bank of Superior never owned these drafts and the bills of lading it could not transfer to any one a good title. It had them for the purpose of making collection. It had no more authority to treat them as its own than a lawyer would have to appropriate the collections placed in his hands. The National Bank of Commerce acknowledged receipt of said sight drafts as follows: "With credit, subject to payment." This shows that there was no absolute and unconditional credit, but the credit was to be subject to payment only.

It is in the testimony that there was an understanding between the First National Bank of Superior and the defendants that the amount of the sight drafts should be

charged back to defendants and against their deposit account if collection should not be made from drawees of the sight drafts. At the same time, if the First National Bank of Superior was insolvent on the 9th of January, 1914, when it closed its doors, it must have been insolvent on the day before and for several days preceding that. It might have been insolvent, and if permitted to do so it might have honestly collected these drafts for the Bossemeyers. If it did not have any authority to collect the money and keep it, it is difficult to understand what right the plaintiff bank would have had to keep it if it had succeeded in collecting it. But it did not succeed, for the Bossemeyers collected the drafts themselves. We are not told in what way the Bossemeyers perpetrated a fraud upon the plaintiff bank. Unless they wronged the plaintiff bank in some way, it has no right to recover anything against the Bossemeyers.

The bank failed on the morning of the 9th of January, 1914. On the morning of the 10th of January, 1914, the First National Bank of Superior had on deposit in the plaintiff bank $8,588.08 according to the testimony of Carl Weil, the vice president. Therefore, there could have been no difficulty in charging back the amount of the uncollected drafts and bills of lading, as they only amounted to about $3,200. He also testified that the First National Bank of Superior had only one account with the plaintiff bank, "the checking account," and that all items forwarded to it were handled through that account, whether indorsed for collection and remittance, or for credit and advice. But he followed that up with a statement: "By agreement with the bank that we give them credit for all items in their checking account and permit them to check against it and have the use of the money, yes, sir." Also, that it was his understanding that items not collected should be charged back. "We were to be recompensed for anything that we could not collect." "Q. I see the dates are stamped on here with a rubber stamp in the collection column. What does that signify, if it signifies anything? A. It is merely, possibly, a careless manner of the clerk in dating."

When he was first asked about the matter he answered that the balance of the First National Bank of Superior on the morning of the 10th of January, 1914, was, "speaking from memory, I think about $1,000." An examination of the record showed $8,588.08. Subsequently he testified that the amount on the morning of the 13th was $4,091.82, "where it remained until the morning of the 28th, $4,096.08; on the morning of March 28th, $4,102.52, at which amount it now stands." The testimony of this witness suggests that he had designs on the grain of the Bossemeyers, or he desired to get a fund ahead to be used as collateral for certain other indebtedness of the First National Bank to his bank.

Ernest Bossemeyer testified that the First National Bank of Superior would charge them interest on the amount of the drafts made from the date they received them until they were collected. His testimony shows a slip of this sort where the Bossemeyer Brothers were charged in four days on this sort of a credit for interest, $14.29. This arrangement appears to have been extended also to the National Bank of Commerce, which charged the defendants in the same way, through their correspondent, the First National Bank of Superior, and also for protest fees.

The plaintiff bank at Lincoln received the drafts to collect them if it could out of the proceeds of the grain when the money should be paid on the drafts according to the bills of lading. The bank at Lincoln gave the bank at Superior a book credit subject to be charged back if the money was not collected from the drawees to whom the grain was sent. When the bank at Superior failed the Bossemeyers immediately countermanded payment of the drafts by wiring the persons to whom the grain was sent, who refused payment of the drafts. Of course the grain had all along been the property of the Bossemeyers because the bank at Superior had paid nothing for it; neither had the bank at Lincoln. The Bossemeyers had a credit with the bank at Superior which they might have checked against, but they did not. The bank at Lincoln was a cor-

respondent of the bank at Superior, and gave that bank a credit which it might have checked against, but it did not. The full amount of the credit in both banks was dependent upon the contingent fact whether the proceeds of the grain should be collected. If not collected, then the banks would lose nothing because they had paid nothing. Whatever is collected by the bank at Lincoln in its action against the Bossemeyers is taken out of their pockets without the Lincoln bank paying anything. Suppose the bank at Superior had kept the drafts until after Bossemeyers wired the purchasers of grain not to pay and then had refused payment, would the bank at Superior have had any sort of valid claim against the Bossemeyers? If so, why not? Of course it must be because it had paid nothing and it had lost nothing. The same is true of the bank at Lincoln. It paid nothing. Neither did it lose anything. It made an entry on its books, but that was not payment. That was a way of keeping an account of the transaction. If the bank at Superior had stayed in business the drafts would probably have been paid by the persons to whom the grain was sent, but because it went out of business the drafts were not paid. Should Bossemeyers lose their money because the bank at Superior failed? That appears to be the effect of the majority decision. The man who buys my horse from the man who has unlawfully appropriated the horse gets no title, and the horse is still mine. The rights of parties where a note has been discounted by a bank and the proceeds credited on the books of the bank to the person from whom it was purchased have been repeatedly stated by text-writers. I quote from 1 Daniel, Negotiable Instruments (6th ed.) sec. 779*b*, as follows: "The apparent purchase must have been a purchase in fact and not a mere bookkeeping entry. *Mere discount and credit do not of themselves constitute a bona fide purchaser for value.* To occupy that position the holder must actually have parted with something of value for the note. Thus, where a bank discounted a note for a company, and credited it with the amount, the credit, on account of other deposits, subse-

quently increasing, so that at the time of suit on the note the bank had actually paid nothing for it, it was held not a purchaser for value."

In Eaton and Gilbert, Commercial Paper, sec. 54, it is said: "A bank by merely discounting a bill or note and placing the proceeds to the credit of the payee does not become a holder for value; but where the bank, on the strength of such credit, has relinquished securities in its possession or made advances to or paid the checks of the payee, it becomes a holder for value."

In 7 Cyc. 929, it is said: "While the authorities are not entirely uniform upon the subject it is fairly well settled that a bank, by discounting negotiable paper, placing the same to the credit of the depositor, and honoring his checks or drafts, surrendering to him securities, or in some other manner making advances and extending its credit on the faith of such deposit, thereby becomes a holder for value. But the mere discounting and crediting of the amount on the depositor's account, without making payment or incurring any increased obligations or liabilities, is not sufficient."

In 4 Am. & Eng. Ency. of Law (2d ed.) 298, it is said: "Where a bank discounts paper for a depositor who is not in its debt, and gives him credit upon its books for the proceeds of such paper, it is not a *bona fide* holder for value, so as to be protected against infirmities in the paper, unless, in addition to the mere fact of crediting the depositor with the proceeds of the paper, some other and valuable consideration passes. Such a transaction simply creates the relation of debtor and creditor between the bank and the depositor; and so long as that relation continues and the deposit is not drawn out, the bank is held subject to the equities of prior parties, even though the paper has been taken before maturity and without notice."

In *Thompson v. Sioux Falls Nat. Bank*, 150 U. S. 231, it is said: "The mere credit of a check upon the books of a bank, which may be canceled at any time, does not make the bank a *bona fide* purchaser for value. If after such

credit and before payment for value upon the faith thereof, the holder receives notice of the invalidity of the check, he cannot become a *bona fide* holder by subsequent payment."

In *Central Nat. Bank v. Valentine,* 18 Hun (N. Y.) 417, the court said: "The mere giving of credit by entering the amount on the books, and not actually parting with a dollar upon the strength of the indorsement, cannot be regarded parting with value in the sense which the law contemplates. The parties in whose favor the credit was given might never draw or appropriate any portion of the fund."

Other authorities along the same line are: *Dykman v. Northbridge,* 80 Hun (N. Y.) 258; *Clarke Nat. Bank v. Bank of Albion,* 52 Barb. (N. Y.) 592; *Thompson v. Sioux Falls Nat. Bank,* 150 U. S. 231; *Manufacturers Nat. Bank v. Newell,* 71 Wis. 309; *Citizens State Bank v. Cowles,* 180 N. Y. 346; *Davis v. Elmira Savings Bank,* 161 U. S. 275; *Ætna Nat. Bank v. Fourth Nat. Bank,* 46 N. Y. 82.

The legislation mentioned in the majority opinion is not aimed to take the property of any person without just compensation or without due process of law, and if that was its purpose such legislation would be void. Const. Neb. art. I, secs. 3, 21; also, Const. U. S., Amend. XIV, sec. 1.