# GYPSY OIL CO. v. MARSH.

No. 15015—Opinion Filed March 16, 1926.

Rehearing Denied July 13, 1926.

(Syllabus.)

**1. Oil and Gas—Validity and Priority of Leases by Common Landowner—Equitable Relief.**

A court of equity has jurisdiction to settle the validity and priority of oil and gas leases between conflicting claimants, where such leases have been executed by a common landowner, and having jurisdiction, the court may grant such relief to either party as the pleadings and proof warrant.

**2. Same—Common Landowner as Unnecessary Party.**

In a suit in equity between conflicting lessees to determine the validity and priority of oil and gas leases, executed by a common landowner, such owner is not an indispensable party, where his title is not drawn into question, and where his interests are not, and cannot be affected, even indirectly, by the decree, and where it is not shown that either party is entitled to any relief as against him.

**3. Oil and Gas—Term of Lease—Construction—"Produced" Equivalent to "Produced in Paying Quantities."**

The terms "produced" and "produced in paying quantities," as used in oil and gas leases for a given term and as much longer as oil or gas is produced, or produced in paying quantities, have substantially the same meaning, and an oil and gas lease containing the following habendum clause: "To have and to hold the same for the term ending December 15, 1922, and as long thereafter as oil or gas or either of them is produced from said land by the lessee, its successors or assigns," expired on December 15, 1922, unless oil or gas was found on the land in paying quantities on or before said date.

**4. Same—"Paying Quantities."**

The term "paying quantities," as used in an oil and gas lease for a given term, and as much longer as oil or gas is produced in paying quantities, means paying quantities to the lessee. If the well pays a profit, even small, over operating expenses, it produces in paying quantities though it may never repay its cost, and the operation as a whole may prove unprofitable. Ordinarily the phrase is to be construed with reference to the operator, and by his judgment, when exercised in good faith.

**5. Estoppel—Elements of "Equitable Estoppel."**

The essential elements of an "equitable estoppel" are: First, there must be a false representation or concealment of facts. Second, it must have been made with knowledge, actual or constructive, of the real facts. Third, the party to whom it was made must have been without knowledge, or the means of knowledge, of the real facts. Fourth, it must have been made with the intention that it should be acted upon. Fifth, the party to whom it was made must have relied on or acted upon it to his prejudice. The representation or concealment mentioned may arise from silence of a party under imperative duty to speak; and the intention that the representation or concealment be acted upon may be inferred from circumstances.

**6. Same—Oil and Gas—Lessor not Estopped to Question Validity of Lease for Lack of Production by Executing Division Order Relating to Production.**

The lessor in an oil and gas lease is not estopped to question . the validity of such lease, as against the lessee, on the ground that oil or gas had not been produced in paying quantities within the life of the lease, because he joined with the lessee in the execution of a division order, where he was without knowledge, or means of knowledge of the quantity of oil or gas produced, and where the lessee possessed such knowledge, or means of obtaining the same, and where it is not shown that the lessee changed its position, or did, or omitted to do, any act to its prejudice because of the conduct of the lessor in executing said division order.

Error from District Court, Carter County; W. F. Freeman, Judge.

Action by Stanley Marsh against the Gypsy Oil Company. Judgment for plaintiff, and defendant appeals. Affirmed.

James B. Diggs, Redmond S. Cole, William C. Liedtke, and C. L. Billings, for plaintiff in error.

Moore & West, Rainey & Flynn, Calvin Jones, M. E. Jordan, and Lydick, McPherren & Wilson, for defendant in error.

NICHOLSON, C. J. On the 25th day of November, 1919, one James Moyer executed and delivered to the Gypsy Oil Company an oil and gas lease covering 80 acres of land then owned by him, and situated in Carter county, for a term ending December 15, 1922, and as long thereafter as oil or gas, or either of them, is produced from said land by the lessee, its successors or assigns. On the 10th day of November, 1922, one William Moyer, the then owner of said land, executed and delivered to Stanley Marsh, an oil and gas lease covering said land for a term of five years from January 2, 1923, and as long thereafter as oil or gas or either of them is produced from said land by the lessee. On or about November 30, 1922, the Gypsy Oil Company started the erection of a derrick on the land and began the actual drilling of a well thereon on December 2, 1922, and completed said well on December 12, 1922, at a depth of about 1,060 feet, and in an oil sand producing a small quantity of 24 gravity oil. After the completion of this well, the Gypsy Oil Company erected a tank on said land and constructed a pipe line from said well to the pipe line of the Coline Oil Company, a distance of more than three and one-half miles, and on January 31, 1923, began delivering the oil from said well to the Coline Oil Company, which paid therefor the sum of 50 cents per barrel. The Coline Oil Company paid for this oil by checks payable to the Gypsy Oil Company and William R. Moyer, in accordance with a division order theretofore signed by them.

On December 18, 1922, Marsh notified the Gypsy Oil Company that the oil then being produced from said lands could not be considered production, within the meaning of the lease, and on January 4, 1923, William R. Moyer wrote the Gypsy Oil Company that it did not have commercial production, and its lease expired December 15, 1922. On February 10, 1923, Marsh purchased from Moyer an undivided one-half interest in the oil, petroleum, gas, coal, asphalt, and other minerals in and under said land, the grant thereof containing a recital that it was subject to any valid oil and gas lease then on said premises, and subsequently he conveyed an undivided one-fourth interest therein to one Woodruff. On February 28, 1923, Marsh brought this suit, claiming under his lease dated November 10, 1922, seeking the cancellation of the lease of the Gypsy Oil Company and an order placing him in the possession of the leased premises, quieting his title thereto, and perpetually enjoining the Gypsy Oil Company from asserting any right, title, or interest in said premises adverse to his claim. A trial resulted in a judgment in favor of Marsh, decreeing him the relief sought, from which the Gypsy Oil Company has appealed.

The oil company contends that Marsh cannot maintain this action because his oil and gas lease is not a grant of the oil and gas that is in the ground, but of such part thereof only as the lessee may find, and passes no estate that can be the subject of ejectment or other real action, and in support of this contention cites Kolachney v. Galbreath et al., 26 Okla. 772, 110 Pac. 902; Warner v. Page, 59 Okla. 259, 159 Pac. 264; Brennan et al. v. Hunter, 68 Okla. 112, 172 Pac. 49; Hill Oil & Gas Co. v. White et al., 53 Okla. 748, 157 Pac. 710; and Frank Oil Co. v. Belleview Gas & Oil Co., 29 Okla. 719, 119 Pac. 660.

If this were an action in ejectment, or other real action, the position taken would be correct, and the doctrine announced in the cases cited would apply, but this is not such an action, but is a suit in equity brought to determine the rights of the parties under their respective leases, and that a court of equity has jurisdiction to settle the validity and priority of oil and gas leases between contesting lessees, where such leases have been executed by a common landowner, is well settled. Thornton on Oil & Gas, vol. 2, sec. 921; Archer's Law & Practice in Oil &

Gas Cases, 895; Trees v. Eclipse Oil Co., 47 W. Va. 107, 34 S. E. 933; Smith v. Root et al., 66 W. Va. 633; Monarch Gas Co. Roy (W. Va.) 95 S. E. 789; Guffey et al. v. Smith, 237 U. S. 101, 59 L. Ed. 856; Kentucky Coke Co. v. Keystone Gas Co., 296 Fed. 320: Logan Natural Gas & Fuel Co. v. Great Southern Gas & Oil Co., 126 Fed. 623, 61 C. C. A. 359; Downey v. Gooch, 240 Fed. 527; Alleghany Oil Co. v. Snyder et al., 106 Fed. 764: Smith v. McCullough et al., 285 Fed. 698. And having jurisdiction, the court may grant such relief to either party as the pleadings and proof warrant

It is next contended that Moyer, the landowner, is a necessary and indispensable party to this suit, and that the same cannot be maintained without bringing him in. Many cases are cited in support of this contention, among which are Shields v. Barrow, 17 How. 130, 15 L. Ed. 158; McConnell v. Dennis, 153 Fed. 547; Moore v. Jennings (W. Va.) 34 S. E. 793; Steelsmith v Fisher Oil Co. (W. Va.) 35 S. E. 15; South Penn Oil Co. v. Miller, 175 Fed. 729.

Shields v. Barrow, supra, merely announces the general rule, that a court of equity can make no decree affecting the rights of an absent person and can make no decree between the parties before it which so far involves, or depends upon, the rights of an absent person that complete and final justice cannot be done between the parties to the suit without affecting those rights. The other cases cited, supra, adhere to this doctrine, and hold that the interest of an absent person would necessarily be affected by the decree. Thus, in McConnell v. Dennis et al., supra, which presented a contest between two rival lessees in oil and gas leases, the facts were that one Amanda Miller, who was prior to July 1902, the owner of the land covered by the leases, did on July 21, 1902, by deed convey the land to one McCready, who, on August 25, 1903, executed an oil and gas lease to McConnell. In this lease there was reserved to McCready as rent and royalty one-sixth of all the oil produced from the premises and $200 per year for each and every gas well sunk and successfully operated thereon. By an instrument dated September 18, 1902 (after she had parted with the title to the land), Amanda Miller leased the same land to Dennis and others. This lease in terms conferred upon the lessees an exclusive right to operate for oil and gas on the leased premises, and reserved to the lessor royalty in the event gas should be produced at the rate of $5 per month during the time production should be taken therefrom, or in lieu there-

of one-tenth of the oil produced. Dennis and others, claiming under the lease from Miller, brought their bill for injunctive relief to restrain McConnell from operating under his lease. He answered justifying his possession under the lease from McCready. A decree was entered as prayed for by complainants, and this decree was reversed for failure to make McCready a party, the court holding that complainants' right to relief necessarily depended upon the validity of the McCready lease; that her rights were materially affected by the decree made, or by any decree that could be made in the case, and that it could not proceed without her, the court stating:

"Nothing could more effectually extinguish Abba Clair McCready's rights secured by the lease than such a decree. Obedience to its command by McConnell necessarily put a stop to her royalties in kind and in money and the enjoyment of the other privileges secured to her by her lease and contract with McConnell. She was not made a party to the suit, and her contract was stricken down without any opportunity to be heard in defense of her rights under it. This is contrary to natural right and well-established principles of equity jurisprudence."

In South Penn Oil Co. v. Miller, supra, the court held:

"A court cannot adjudicate rights under conflicting oil leases of the same property, executed by different lessors, and each providing for the payment of royalties, in a suit between the lessees to which the lessors are not parties."

The other cases cited are to the same effect, but in none of them did the contesting lessees claim under a common lessor, as in this case. In those cases it is apparent that the rights of the lessors would necessarily be materially affected by the judgment, while in this case it is not pointed out wherein the rights of Moyer will be in anywise affected by the decree. His title to the land is not drawn into question. By the terms of the respective leases, he is to receive the same rents and royalties. It is, so far as the record discloses, immaterial to him which of the lessees develops this property. It is not shown what relief, if any, either party is entitled to as against him, or in what manner either party is or could be affected by his absence. We are unable to see wherein he is so interested, even indirectly, in the subject-matter and the relief granted that his rights or property might be affected by the decree.

In Pomeroy's Equity Jurisprudence, section 114, it is said:

"* * * The governing motive of equity in

the administration of its remedial system is to grant full relief, and to adjust in the one suit the rights and duties of all the parties, which really grow out of or are connected with the subject-matter of that suit. Its fundamental principle concerning parties is that all persons in whose favor or against whom there might be a recovery, however partial. and also all persons who are so interested although indirectly, in the subject-matter and the relief granted, that their rights or duties might be affected by the decree, although no substantial recovery can be obtained either for or against them, shall be made parties to the suit. * * *"

In Shields v. Barrow, supra, it was held that those whose interests are separable from those before the court are not indispensable parties.

Cahill et al. v. Pine Creek Oil Co. et al., 40 Okla. 176, 136 Pac.. 1100; Guffey et al. v. Smith, supra; Monarch Gas Co. v. Roy, supra; Kentucky Coke Co. v. Keystone Gas Co., supra; Downey v. Gooch et al... supra; Allegheny Oil Co. v. Snyder, supra; Smith v. McCullough, supra; Trees v. Eclipse Oil Co., supra; and Atlas Oil Co. v. McCormick (La.) 103 South. 767, were suits between conflicting lessees, claiming under common lessors who were not parties to the suits, and while the question of necessary parties does not appear to have been determined, or raised, in either case, it is but fair to presume that the courts were of the opinion that the interests of the lessors were not affected by the decree, and that they were not deemed to be necessary parties. If they had been indispensable parties, it would have been so found. as the courts could not have avoided considering the question of whether the parties were sufficient to warrant a decree granting any relief. McConnell v. Dennis et al. supra; Hooey v. Wilson, 9 Wall. 501, 19 L. Ed. 762.

Having concluded that Moyer was not an indispensable party, it follows that the trial court committed no error in determining the rights of the parties before it in his absence.

The Oil Company further contends that it produced oil within the terms of the lease and that it thereby became vested with a limited estate in the leased premises for further operation in accordance with the terms of the lease, and that such estate continues until forfeited through its failure to perform the covenants of said lease.

The lease under which the Oil Company claims contains the following habendum clause:

"To have and to hold the same for a term ending December 15, 1922, and as long thereafter as oil or gas or either of them is produced from said land by the lessee, its successors or assigns."

It is insisted that this clause is plain and unambiguous and that effect should be given to it as expressing the intention of the parties to the lease, and Strange v. Hicks, 78 Okla. 1, 188 Pac. 342: Anthis v. Sullivan Oil & Gas Co. et al., 83 Okla. 86, 203 Pac. 187; and Gypsy Oil Co. v. Ponder et al., 92 Okla. 181, 218 Pac. 663, are cited as authority for this contention.

In Strange et ai. v. Hicks et al., supra, it was held that the provision of the lease that it "shall remain in force for two years and as long thereafter as oil or gas or either of them is produced from said land by the party of the second part," was ambiguous and uncertain, and the court was authorized to take oral proof to ascertain the intention of the parties. In the other two cases cited this court held that leases containing like habendum clauses were unambiguous, but in neither case did the court attempt to define the meaning of the word "produced," as used in this connection.

Some authority may be found holding that if a lease is to continue so long as oil or gas is produced, it is immaterial whether the lease is a paying one or not, for so long as the well drilled produces either oil or gas, the lease continues. Thornton's Law of Oil and Gas, vol. 1, sec. 150, citing Gillespie v. Ohio Oil Co., 260 Ill. 169, 102 N. E. 1043. The construction there given the term "produce" does not appeal to us, because the very purpose of the landowner in executing the lease is to have the oil and gas on the leased premises produced and marketed so that he may receive his royalty therefrom, and the purpose of the lessee is to discover and produce oil and gas in such quantities as will yield him a profit These are material elements to be considered in the interpretation of the contract. and if consideration is given these elements, it must be held that the word "produce," when used in this connection, means something more than mere discovery of a trace of oil or gas, or the discovery thereof in quantities so small as to render operation of the well unprofitable. Such a well would be of no benefit to either party.

In Parks v. Sinai Oil Co., 83 Okla. 295, 201 Pac. 517, this court had occasion to consider a lease containing, in effect, the same provision as is contained in the lease here under consideration. and it was there held that when the lease provided that it should remain in force for a term of one year from

date, and so long thereafter as oil or gas is produced, it was a condition precedent to the extension of the lessee's right to continue operations beyond the one year that oil or gas should be found in paying quantities within one year from the date of the lease. Thus, it will be seen that this court is committed to the doctrine that when used in this connection, the terms "produced" and "produced in paying quantities" mean substantially the same thing. We have no desire to depart from the holding in that case, but believe that the construction there placed upon the contract is in harmony with the plain intent of the parties, and to hold otherwise would give to the term "produced" a meaning not within the contemplation of either party. Hence, in the case at bar, in order that the Gypsy Oil Company might be vested with a limited estate for further development, it was incumbent upon it to discover oil or gas in paying quantities on or before December 15, 1922.

This brings us to a consideration of the question of whether or not oil or gas was discovered in paying quantities before the expiration of the original term of the lease.

Much has been said in the briefs and oral argument as to the equities of the respective parties, but, as we view the case, it is not one calling for undue solicitude on the part of a court of equity. The facts are that the Gypsy Oil Company first obtained a lease on the premises here involved on December 15, 1914, which lease ran for a term of five years from its date. No attempt to develop the property under this lease was ever made, and on November 16, 1916, it obtained another lease for a term of three years from December 15, 1916, and no development was attempted under this lease. On November 25, 1919, it obtained the lease here involved, which by its terms expired on December 15, 1922. Nothing was done toward developing the property under this lease until about November 30, 1922, and after Marsh had obtained a lease on the premises, when, after failing to obtain a further extension of the lease, and failing to purchase the lease held by Marsh, a well was started; Marsh obtaining his lease on November 10, 1922, with full knowledge of the outstanding lease to the Gypsy Oil Company, for an agreed consideration of the sum of $3,500. This lease was executed upon the understanding of Moyer, the lessor, and Marsh that an existing lease of the Gypsy Oil Company would terminate on December 15, 1922, but in the event it should occur that the lease to the Gypsy Oil Company would not terminate on that date, then the lessor should not be bound by the contract and should return to Marsh the sum of $500 that day paid as a portion of the consideration. The lease thus executed was placed in escrow in the Tradesmens National Bank of Oklahoma City to be delivered to Marsh upon payment of the sum of $3,000, the balance of the purchase price. On or about December 9, 1922, the Gypsy Oil Company discovered oil in its well on the premises at a depth of about 1,062 feet. Afterward, and on or about December 23, 1922, Marsh paid the sum of $3,000, the balance of the purchase price, and obtained the lease executed to him, and notified the Gypsy Oil Company that it did not have a well within the meaning of the contract, and to vacate the property. It further appears that oil bearing sand had been encountered at a depth of approximately 1,000 feet in most, if not all, of the wells drilled in the vicinity of this lease, but that it had never been thought by anyone operating there that said sand would produce oil in paying quantities, and no one had attempted to produce oil therefrom. It further appears that wells in this vicinity had but recently encountered production in paying quantities at a depth of about 2,650 feet. From the foregoing, the conclusion cannot be escaped that the fact of the discovery of oil in a deeper sand led both parties to believe that the lease in question had become valuable. That after its failure to obtain an extension of its lease from Moyer, and its failure to purchase the lease from Marsh, the Oil Company attempted to produce oil from the shallow sand known to exist, and which had never been considered a paying sand in such quantities as would extend its lease, so that it might at a later date drill to the deeper sand. On the other hand, Marsh took his lease at a time when the Oil Company's lease was in force, and more than 30 days before it would expire, unless it was extended by the production of oil or gas, and paid his money and obtained his lease after the company had discovered oil in the shallow sand, and at a time when he knew it was claiming an estate in the premises because of such discovery, and knowing that he was purchasing litigation. Therefore, we see no occasion for a court of equity placing its protecting arm around either party, but think the only question to be considered is whether or not the Gypsy Oil Company discovered oil in paying quantities within the life of the lease.

There is no dispute as to the fact that oil was discovered within the life of the lease, but the question is, whether the oil so discovered was in paying quantities.

It has been generally held that "paying quantities," when used in this connection, means paying quantities to the lessee. If a well pays a profit, even small, over operating expenses, it produces in paying quantities, though it may never repay its costs, and the enterprise as a whole may prove unprofitable. Ordinarily, the phrase is to be construed with reference to the operator, and by his judgment, when exercised in good faith. Lowther Oil Co. v. Miller-Sibley Oil Co. (W. Va.) 44 S. E. 433; Young v Forest Oil Co. (Pa.) 45 Atl. 121; Aycock v. Paraffine Oil Co. (Tex. Civ. App.) 210 S. W. 851. See, also, Pelham Petroleum Co. v. North, 78 Okla. 39, 188 Pac. 1069. Hence, the inquiry presented is, Will the production of the oil discovered during the life of the lease yield the Oil Company a profit, though small, over operating expenses?

The record discloses that no oil was run from the well on or prior to December 15, 1922; that the first oil delivered to the Coline Oil Company, the purchaser, was on January 31, 1923, and amounted to 145.31 barrels. There is no evidence showing what the well produced on or prior to December 15, 1922, the date of the expiration of the lease, but the testimony of witnesses for the Gypsy Oil Company is that the well produced about 10 barrels the first day it was put on the pump, and that the average daily production of such well for the first 10 or 15 days was about 10 barrels; and Marsh admitted that the daily production for this period amounted to 10.5 barrels, so we will take the latter figure as the initial production, which, at the price of 50 cents per barrel, the price for which the oil sold, would yield a daily income of $5.25, only seven-eighths of which belonged to the operator. The evidence shows that the oil company paid its pumper the sum of $135 per month, and that the cost of fuel would amount to from $15 to $25 per month; so, if we take the lower figure, we find that the expense of operating, without taking into account extra expenses incurred in cleaning the well, which the evidence shows was necessary, would amount to $5 per day. According to these figures, which are the most favorable to the oil company, it would derive an income of approximately $4.60 per day, which would produce a loss instead of a profit. The total production of the well for a period of 175 days preceding the trial of this case was 518 barrels. This was less than three barrels per day, though a witness for the Oil Company testified that the average daily production was about 6 barrels. This evidence shows that the initial production was the greatest,

and as before stated, that production was not sufficient to produce a profit, but entailed a loss From the foregoing, and from the facts and circumstances hereinbefore mentioned, we are forced to the conclusion that the claim of the Oil Company that it had discovered oil in paying quantities within the life of the lease is not made in good faith. We are unable to understand how a well which must be operated at a loss to the lessee, and for which the lessor's royalty of one-eighth is less than the rental he would receive under the terms of the lease if no well had been drilled, can be said to be production in sufficient quantities to extend the term of the lease, and we cannot so hold.

Finally, the Oil Company contends that Marsh is estopped to question the validity of its lease because Moyer, the owner of the land, executed a division order reciting that he was the owner in fee of the land and the oil royalties thereupon, and authorizing a purchaser of the oil to receive the same and disburse the proceeds in accordance with said division order on the basis of one-eighth to him and seven-eighths to the company, and since Moyer is estopped to deny the validity of the lease, Marsh, the subsequent lessee, who took his lease with full knowledge of the possession of the Oil Company and of facts constituting said estoppel, could acquire no interest superior to that of the lessee in possession.

If Moyer would be estopped to question the rights of the company, Marsh, being in privity with him, is likewise estopped, so it becomes necessary to consider only the conduct of Moyer.

The division order executed by Moyer and the Gypsy Oil Company, and relied upon as constituting an estoppel, was dated December 19, 1922, after Marsh had notified the company that it did not have production within the meaning of its lease, was directed to the Coline Oil Company, and recites that:

"The undersigned certify and guarantee that they are the legal owners of all wells Nos. 1 and upon the Gypsy-James Moyer No. 2 farm * * * including the royalty interest, and until further notice, you will give credit for all oil received from said wells as per directions below: * * * Gypsy Oil Company ⅞ W. I. * * * William R. Moyer ⅛ R. I. * * *"

It is insisted that this division order furnished a positive admission and declaration that the well in question is owned by the parties who signed it; that the effect of this order is that the owner of the land recognized the existence at that date of the leasehold interest of the plaintiff in error, and

ander the law this contract estopped Moyer to question the truthfulness of his positive admission and guarantee therein expressed, and Headley v. Hoopengarner ( W. Va.) 55 S. E. 744; Connette v. Wright (La.) 98 South. 674; Hogg v. Magnolia Pet. Co., (Tex. Civ. App.) 267 S. W. 482; and Texas Co. v. Pettit. 107 Okla. 243, 220 Pac. 956, are cited as sustaining this contention.

While these cases properly applied the doctrine of estoppel, the facts dealt with bear no resemblance to the facts in this case, and cannot be accepted as controlling here.

It cannot be said that Moyer expressly agreed that the well drilled, produced oil in paying quantities or that the lease of the company had been extended because thereof, for no such recital is contained in the division order, and if he is estopped, it is because of his conduct in signing the division order wherein he said to the Coline Oil Company that he and the Gypsy Oil Company owned the well, and that the oil received there from should be credited to them in the proportion mentioned. This division order was signed before any oil was run from the well, and at a time when Moyer did not know and could not have known what quantity the well would produce, and at a time when only the Oil Company, if any one, had knowledge of the probable production. As soon as Moyer discovered that the well did not produce oil in paying quantities, he so notified the company and requested it to vacate the premises.

In Texas Company et al. v. Pettit et al., supra, it was held that the execution and delivery to the pipe line company receiving the oil, of a division order designating the interest claimed by each party in and to the oil and gas produced, was such an assignment of interest as would be binding between the parties executing it and the pipe line company and operated as an estoppel in pais, as to the party executing the same, from recovering a greater sum against the pipe line company than the amount of the interest designated in the division order, and it was there said:

"The essential elements of an 'equitable estoppel' are: First, there must be a false representation or concealment of facts. Second, it must have been made with knowledge, actual or constructive, of the real facts. Third, the party to whom it was made must have been without knowledge, or means of knowledge, of the real facts. Fourth, it must have been made with the intention that it should be acted upon. Fifth, the party to whom it was made must have relied on or acted upon it to his prejudice. The represen-

tation or concealment mentioned may arise from silence of a party under imperative duty to speak; and the intention that the representation or concealment be acted upon may be inferred from circumstances."

It certainly would not be claimed that if the well drilled had been absolutley dry, the execution of a division order would estop the lessor to show such fact or to show that the lease had terminated because of the lessor's failure to produce oil within its terms, and it could not be said that if a lessor signed a division order without knowledge of the facts, he would be estopped to show that the lessee had failed to comply with the terms of the lease, for it is essential to the doctrine of equitable estoppel that the party sought to be estopped should have had knowledge of the facts. Globe Mutual Life Ins. Co. v. Wolff, 95 U. S. 326, 24 L. Ed. 387; Supreme Lodge, Knights of Pythias, v. Beck, 181 U. S. 49, 45 L. Ed. 741.

It is also essential that the party alleging the estoppel must prove that he did not know the truth. A party acquainted with the facts when the alleged misleading conduct took place cannot assert an estoppel based upon such conduct. Hobbs v. McLean et al., 117 U. S. 567, 29 L. Ed. 940; Steel et al. v. St Louis Smelting & Refining Co., 106 U. S. 447, 27 L. Ed. 226; Brant v. Virginia Coal & Iron Co., 93 U. S. 326, 23 L. Ed. 927. A careful consideration of the record in this case convinces us that the Oil Company was conversant with the facts and knew that it had not discovered oil in paying quantities at the time of the execution of the division order. The record fails to disclose that the company was misled to its injury by the actions of Moyer; that it changed its position or did, or omitted to do, any act to its prejudice because of his conduct, and these are likewise necessary elements of an estoppel in pais. Jones v. United States, 96 U. S. 24, 24 L. Ed. 644; Tompson v. Sioux Falls National Bank, 150 U. S. 231, 37 L. Ed. 1063; St Louis v. Western Union Tel Co., 148 U. S. 93, 37 L. Ed. 380; Ketchem v. Duncan, 96 U. S. 659, 24 L. Ed 868; Stone v. Bank, 174 U. S. 412, 43 L. Ed. 1028.

An examination of the entire record convinces us that the judgment of the trial court is correct, and such judgment is affirmed.

All the Justices concur, except HARRISON, J. absent.

Note.—See under (1, 2) 27 Cyc. p. 722 (Anno). (3) 27 Cyc. p. 722. (4) 27 Cyc. p. 723. (5) 21 C. J. p. 1119 §122; pp. 1120, 1122 §124; p. 1123 §126; p. 1126 §130; p. 1129

§131; p. 1133 §134; p. 1152 §154. (6) 21 C. J. p. 1123 §126; p. 1129 §131; p. 1133 §134.