[Civ. No. 17453. Second Dist., Div. One. Nov. 20, 1950.]

PAUL J. BARNARD et al., Respondents, v. T. M. GIBSON, Appellant.

Churchill & Teague and E. Perry Churchill for Appellant.

Sheridan, Orr, Bates & Barnes and Frank E. Orr for Respondents.

WHITE, P. J.—This is an appeal from a judgment for plaintiffs in an action to quiet title. Plaintiffs are the lessors in an oil and gas lease covering the property in question, and the defendant and appellant T. M. Gibson, through mesne conveyances, succeeded to the interest of the lessees under the lease. The complaint was in the usual form to quiet title and did not mention the lease. Defendant T. M. Gibson answered, pleading the existence of the lease, and also filed a cross-complaint seeking to quiet her title as lessee. Plaintiffs in their answer to the cross-complaint pleaded a general denial and a claim of ownership. The trial, however, proceeded upon the theory that the action was one to declare a forfeiture of the lease for failure of the lessee to remedy a default thereunder after notice of default had been given.

The trial court found that the lessee had been in default under the drilling obligations of the lease; that notice of default had been given; that the lessee did not within the thirty days specified in the notice "begin to remedy the default specified or any of them, nor did she at any time undertake or commence drilling operations, or any work or actual operations on said land in good faith for the purpose of carry-

ing out her duties under said lease." The court further found that at the time of notice of default and thereafter "there was no well producing or being drilled on said land in respect to which the lessees, including T. M. Gibson, were not in default." The court concluded that there had been a forfeiture of the entire lease, including the two wells in existence on the property, and entered judgment quieting title in plaintiffs as against defendant T. M. Gibson.

The appealing defendant, T. M. Gibson, contends that the findings and judgment are not supported by substantial evidence, for the reason that the assertedly uncontradicted evidence shows:

". . . (a) that within the thirty-day period prescribed by the notice of default the appellant as lessee did 'begin to remedy' the defaults specified in the notice of default in accordance with paragraph 21 of the lease, that she did so in good faith, and indeed, within the thirty days specified, commenced the actual drilling of a well for oil and gas; (b) that the uncontradicted evidence shows that at all times one well drilled by the lessee on the premises was actually being produced by the lessee, and (c) that at the time the respondents served their notice of default the lessees were actually engaged in operations on the other well on the premises under a plan whereby the existing hole was to be used for further drilling operations, and (d) that in order to comply with the demands contained in respondents' notice of default the lessee stopped the work in progress on the old hole and commenced the actual drilling of another well within the thirty-day period specified in the notice of default."

The lease here in question provided that upon the violation of any of its terms by the lessee "and the failure to begin to remedy the same within thirty days after written notice from the lessor so to do, then, at the option of the lessor, this lease shall forthwith cease and terminate, and all rights of the lessee in and to said land be at an end, . . ." The notice of default specified, among other things, that the lessee was in default, in that more than 90 days had elapsed since the completion of a well and one well had not been drilled for each 10 acres under the lease, and no operations for the drilling of another well had been commenced, and no operations for drilling for oil were being conducted diligently or at all. Paragraph 25 of the lease defined "drilling operations" as "any work or actual operations undertaken or commenced in good faith for the purpose of carrying out any of the

rights, privileges or duties of the lessee under this lease, followed diligently and in due course by the construction of a derrick and other necessary structures for the drilling of an oil or gas well, and by the actual operation of drilling in the ground.''

The argument of appellant is that the uncontradicted facts show that within the thirty days specified she actually ''spudded in'' a new well and thus commenced the actual drilling within the 30-day period; that by actually sinking the bit in the ground the lessee went farther than required under the terms of the lease, which require only that the lessee ''begin to remedy'' the default within thirty days.

The facts and evidence shown by the record are as follows: At the time of the execution of the lease Well No. 1 was in existence on the premises. A corporation known as Transcal Oil Company drilled Well No. 2. In August, 1947, one J. O. Smith was the holder of the lessee's interest. Smith had performed substantial work in improving the two wells and placing them on production, but the output from the two wells was relatively small. In August, 1947, Smith was in default under the lease, in that operations for the drilling of a third well had not been commenced. About this time it was orally agreed between Smith and Mr. Barnard, one of the lessors, to the effect that the drilling obligations would be considered complied with if within thirty days Smith would commence the operation of pulling some casing out of Well No. 1 to a certain depth and from that depth whipstocking to reach a new location for the bottom of the hole. Smith did not begin operations within thirty days, but some months later, in January of 1948, Smith, in association with appellant employed one Lance Fletcher, who moved on the property with a rotary rig and worked on the well pulling casing from January 10, 1948, to March 14, 1948.

The notice of default was served on J. O. Smith on or about February 19, 1948. Mr. Smith died a few days later. During the 30-day period appellant Gibson entered into a contract with one Henry L. Hall, pursuant to which Hall, on March 19, 1948, brought his equipment on the property, and on March 20 ''spudded in.'' Hall's equipment consisted of a ''Model L. Forthworth Spudder,'' described as a portable cabletool rig mounted on the rear of a truck and powered by the truck motor. This equipment was designed primarily for the drilling of water wells. It was considered capable of drilling to a depth of 750 feet, and, according to the testimony of

Mr. Hall, his father had at one time reached a depth of 1,250 feet with it. The two wells in existence on the property had been bottomed at a depth of approximately 1,600 feet. The trial judge, in a memorandum opinion, stated that, based upon the testimony of Lance Fletcher as to the suitability of this portable rig, he concluded and therefore found that "The Hall rig with which the default was sought to be remedied and drilling operations carried on (following the notice of default) was not adapted, in the geological structure involved, to the work—nor in using it to commence drilling and to thereafter carry on drilling operations—did defendant either act in good faith or diligently or in conformity with the clear language of the provisions of the lease."

Appellant asserts that the testimony of Lance Fletcher was in substance merely that in his opinion it was preferable to use rotary drilling equipment rather than cable-tool equipment, and that he admitted that there was a difference of opinion among operators in the field as to whether cable tools or rotary equipment should be used to drill the first 600 feet, and that prior to 1939 all wells in the area had been drilled with cable-tool equipment. It follows, appellant urges, that she was justified in accepting the opinion of her expert that the cable-tool rig should be used for drilling the first 600 feet, and the court's finding that she did not act in good faith is without support in the evidence. It is urged that, as was held in *Wilcox* v. *West*, 45 Cal.App.2d 267 [114 P.2d 39], in a situation somewhat parallel to the case at bar, where two inferences, equally reasonable, may be drawn from the proved facts, the one favoring fair dealing and the other favoring corrupt practice, it is the duty of the court or jury to draw the inference favorable to fair dealing.

It may well be that the evidence might have supported a finding that appellant had cured the default. But it cannot be held as a matter of law that the finding made by the court is without evidentiary support.

The apparent disagreement as to the suitability of cable tools is not the controlling point. The facts are that after the notice of default was given, appellant took the following steps to remedy it: (1) Selected a location for a third well. (2) Secured a permit. (3) Caused to be moved on the property a portable water-well rig. (4) Spudded in with this rig. In the meantime, the work on Well No. 2 was abandoned. As pointed out by the trial judge in his exhaustive memorandum

opinion, the drilling covenants of the lease are continuing covenants, and under them the lessees were obligated to commence a third well within 90 days after the completion of Well No. 2. No well was commenced, and thus, in March or April of 1947, there was a violation of the drilling covenants which continued right up to the time of the trial of the cause, since the attempted drilling with the water-well rig was abandoned after the present action was filed. Considerable reliance is placed by appellant on the oral agreement between plaintiff and J. O. Smith to the effect that the whipstocking operations on Well No. 2 would be considered a compliance with the drilling requirements. However, as the trial judge pointed out, the agreement was that such operations would be commenced within 30 days from the time of the conversation, which took place some time in August, 1947, and it was not until January 28, 1948, nearly six months later, that Smith employed Lance Fletcher to commence the operations of pulling the casing and preparing to whipstock. It could be concluded also from the testimony that at the time of the notice of default this operation was not being pursued with the greatest diligence, and it was subsequently abandoned.

Thus the trial court had before it a situation of protracted delay on the part of the lessees in complying with drilling requirements under the lease, a demand that the defaults be remedied, followed by a last-minute attempt to avoid the default by attempting to start a third well with improvised portable equipment incapable, according to testimony given, of drilling to the depth necessary. The entire equipment on the job, according to one witness, was the portable spudder, a utility trailer, some barrels and a tank of water. No concrete footings had been poured, nor was there any other evidence of preparations for a permanent structure. In such circumstances, it would appear that the trial court's conclusion that the lessee did not act diligently or in conformity with the clear language of the lease, is supported by substantial evidence. The acts of the lessee here could well be held insufficient to evince a bona fide intention to invest the funds necessary for the installation required to drill to the requisite depth.

With respect to appellant's contention that even though the lease be forfeited, she was entitled to retain Well No. 2 and ten acres surrounding it, as a well "producing or being drilled and in respect to which Lessee shall not be in default,"

we quote from the memorandum of decision prepared by the trial judge:

"The well is not a well which produces oil or has produced *it in paying quantities*—and it is by that standard that the matter must be judged. It is immaterial what test is applied. If the test of cost of drilling plus cost of operation is used, it is clear beyond all doubt that the well does not produce in paying quantities. (This is the test laid down in *Riedman* v. *Barkwill* (1934), 139 Cal.App. 564, 566, 567 [34 P.2d 744], and in many other cases which will be found collected in exhaustive notes in 48 A.L.R. 887, 84 A.L.R. 761, and 91 A.L.R. 900.)

"If the test, on the other hand, is whether the well can be operated for less than the cost, merely, of operation, the evidence discloses (particularly in view of defendant's testimony as to operating expenses) that costs exceed profits. (This is the test laid down in many of the cases cited by defendant in her brief—and in many other cases in the notes in 48 A.L.R. 887, 84 A.L.R. 761, and 91 A.L.R. 900.)

"In connection with this last test, there is testimony in the case that the Transcal Well produced and produces 8 barrels of oil per day. This is not borne out by the production records of the well. . . . These records show, for the total period of 527 days involved, a total production of 1,662.5 barrels—or 3.15 barrels per day—which at $2.18 per barrel for 30 days gives a total return of $206.00 per month. The testimony on costs shows operating expense to be $213.00 per month.

"If the third or discovery-well test is applied (that laid down in *Hopper* v. *Elliott* (1937), 8 Cal.2d 734, 739, 740 [68 P.2d 235], whether oil has been discovered 'in such quality and quantity as to inspire a person of ordinary prudence in the further expenditure of his labor and means,'— the result is the same. . . .''

■ Appellant urges that there is no need for judicial interpretation of the language of the lease, and cites authorities to the effect that under this provision it is immaterial whether the well is producing in paying quantities, so long as it is producing. We think the better view is that adopted by the trial court, that the production must be substantial, and profitable. It is said in 58 Corpus Juris Secundum, at page 469: "Under a lease for a specified period and as long thereafter as oil or gas is 'produced' from the land, it has generally been held that the word 'produced' means the same,

or substantially the same as 'produced in paying quantities.' Thus it is not sufficient, in order to continue the lease beyond the primary period, to have any production, however small. The production must be tangible and substantial and in such quantities as to yield a profit; the oil or gas must be produced in such quantities as to be susceptible of division and to pay the landowners a royalty, even though small." And as was stated in *Caldwell* v. *Alton Oil Co.*, 161 La. 139 [108 So. 314], "It was never contemplated that the lease under consideration should be continued for all time to come upon the mere production of oil in quantities not sufficient to compensate the lessee and totally inadequate as a consideration to the lessor for continuing the lease." See, also, *Gas Ridge* v. *Suburban Agricultural Properties,* 150 F.2d 363 (cert. denied 326 U.S. 796 [66 S.Ct. 487, 90 L.Ed. 485]) ; *Garcia* v. *King,* 139 Tex. 578 [164 S.W.2d 509] ; *Berthelote* v. *Loy Oil Co.,* 95 Mont. 434 [28 P.2d 187] ; *Gypsy Oil Co.* v. *Marsh,* 121 Okla. 135 [248 P. 329, 48 A.L.R. 876].

The meaning of the term "paying quantities" is stated in *Transport Oil Co.* v. *Exeter Oil Co.,* 84 Cal.App.2d 616, 622 [191 P.2d 129], as follows: "By the great weight of authority, the term 'paying quantities,' when used in the extension clause of an oil lease habendum means production in quantities sufficient to yield a return in excess of operating costs, even though drilling and equipment costs may never be repaid and the undertaking considered as a whole may ultimately result in a loss. . . ."

The contention is made that it was error to include in the calculations made by the trial judge a charge of $83 per month over the period of production for cleaning out the well. It is also urged that it was error to compute the barrels per day production by dividing the total production into the total number of days, thus arriving at the figure of 3.15 barrels per day, but that the days during which the well was being cleaned or repaired should be excluded, thus arriving at a figure of 8 barrels per day. These contentions cannot be sustained. The figure of $83 as a monthly average of the cost of cleaning is a conservative one. Appellant herself testified that the well had been cleaned "three different times that I know of" and that it cost $1,000 for one cleaning operation, and further, that the cleaning of wells was a continuous operating cost in maintaining production. Clearly, in determining whether a well is producing in paying quantities, the fact that it is a well that has required frequent cleaning

with consequent loss of production, is a factor properly taken into consideration.

■ The claim of waiver or estoppel based on the agreement of August, 1947, that the operation of removing casing and whipstocking Well No. 1 would constitute a compliance with the drilling requirements of the lease is sufficiently answered by the fact that under the evidence the conclusion of the trial court adverse to appellants is amply supported. Among other things, as pointed out by the trial court, the lessees were in default when the agreement was made with J. O. Smith, and he failed to fulfill the agreement according to its terms by commencing whipstocking within 30 days. The evidence fully supports the conclusion that the lessees were not misled by or induced to act upon any statement or representation of the lessors, and hence an essential element of estoppel is missing.

The judgment is affirmed.

Doran, J., and Drapeau, J., concurred.