**CEDAR CREEK OIL AND GAS COMPANY, a corporation, International Trust Company, a corporation, H. C. Smith, Susan M. Wight and W. B. Haney, Appellants,**

v.

**FIDELITY GAS COMPANY, a corporation, Montana-Dakota Utilities Company, a corporation, and Shell Oil Company, a corporation, Appellees.**

No. 15293.

United States Court of Appeals
Ninth Circuit.

Oct. 22, 1957.

As Amended on Denial of Rehearing
Dec. 12, 1957.

Leif Erickson, J. R. Richards, Helena, Mont., for appellant.

Coleman, Jameson & Lamey, Billings, Mont., Faegre & Benson, R. L. Nordbye, Armin M. Johnson, Minneapolis, Minn., Raymond Hildebrand, Glendive, Mont., Howard M. Gullickson, Charles N. Wagner, Denver, Colo., for appellees.

Before HEALY, FEE, and HAMLEY, Circuit Judges.

HAMLEY, Circuit Judge.

This is an action to quiet title to certain oil leases and lands in Fallon county, Montana. It was brought by Cedar Creek Oil and Gas Company, Mondakota Gas Company, International Trust Company, Susan M. Wight, H. C. Smith, and W. B. Haney. Each of these plaintiffs holds one or more government permits and leases, or fee leases, on certain tracts involved in this suit. The complaint states two causes of action as to each plaintiff, making twelve causes of action in all.[1]

The defendants are Fidelity Gas Company, Montana-Dakota Utilities Company, and Shell Oil Company. Their claimed rights under a series of oil exploration, drilling, and production agreements constitute the cloud upon plaintiffs' title which is sought to be removed.

After a trial to the court without a jury, findings of fact and conclusions of law favorable to defendants were made and entered. In the judgment which was then entered, it was decreed that the agreements upon which defendants rely are valid, subsisting, and in full force and effect. It was further adjudicated that plaintiffs hold their respective interests in the described tracts subject to such agreements. Plaintiffs appeal.[2]

It was not questioned at the trial, and is not questioned here, that, if the agreements upon which appellees rely are in full force and effect, appellants could not prevail in the action. It is appellants' position that those agreements have expired by their own terms, or have been abandoned. Appellees dispute these contentions. They also argue that, in any event, appellants are precluded, by reason of estoppel, laches, or waiver, from obtaining relief in this action.

The trial court held for appellees on the grounds of estoppel, laches, and waiver, and so did not reach the merits of the controversy. Asserting that the trial court erred in so ruling, appellants contend that appellees did not sustain the burden of proving all of the essential elements of estoppel, laches, or waiver.

We turn first to the question of estoppel, which the trial court emphasized in its memorandum opinion.

The facts pertinent to this defense, substantially as found by the trial court, are as follows: The lands here involved are situated upon a geological formation known as the Cedar Creek Anticline, which comprises a great number of acres.

---

1. The third and fourth causes of action, in which Mondakota Gas Company was named plaintiff, were dismissed by stipulation. Further reference to "plaintiffs" herein will not include Mondakota.

2. Appellees, asserting that appellants' notice of appeal was given too late, raised the question of this court's jurisdiction in a motion to dismiss the appeal. The motion was denied, 9 Cir., 238 F.2d 298.

Appellees have now invited us to re-examine this matter in the light of the recent case of F. & M. Schaefer Brewing Co. v. United States, 2 Cir., 236 F.2d 889, in which certiorari has been granted. 353 U.S. 907, 77 S.Ct. 667, 1 L.Ed.2d 662. Our reading of Schaefer does not convince us that this appeal should be dismissed.

During 1934 and 1935, ninety per cent of the owners of the affected oil and gas working or operating interests, including all of appellants or their predecessors in title, entered into agreements for a co-operative or unit plan of development of the anticline. These agreements were entered into with Gas Development Company, predecessor to appellee Montana-Dakota Utilities Company. The lands and leases of appellants are located in what is known as Unit 5 in this unit plan.[3]

The unit plan agreements apply primarily to the development, production, and marketing of natural gas from upper sands known as the Judith River Sand. Under the agreements, however, Gas Development Company was given the right to commit all the interests of the signatories to the agreements, including their interest in the oil and gas below the Judith River Sand, to any similar unit plan of operation approved by the Secretary of the Interior.

At approximately the same time that the unit plan of development was entered into, appellants or their predecessors entered into gas purchase agreements with Montana-Dakota Utilities Company, or its predecessor. At about the same time, they also entered into so-called operating agreements with Fidelity Gas Company, a wholly-owned subsidiary of Montana-Dakota Utilities Company. For the purpose of this suit, the interest which appellees presently assert in the lands in question is based primarily upon these Fidelity operating agreements. On this appeal, our attention is accordingly directed primarily to these agreements.

Except as to dates, land descriptions, and parties involved, all of the Fidelity operating agreements are identical. They grant and sublease to Fidelity, as operator, the oil and gas working rights of appellants. The purpose of the agreements is to set up a cooperative exploratory and development program on the entire Cedar Creek Anticline, as a struc-tural entity, in horizons below two thousand feet.

Under the terms of the Fidelity operating agreements, Fidelity was bound to commence drilling a test well somewhere on the anticline within one year after the execution of certain operating agreements. In the event the well so drilled failed to encounter commercial production, Fidelity had the option to drill additional test wells

"* * * under like terms and conditions and at such times as shall be deemed by it to be good oil field practice, having due regard that the drilling operations hereunder are purely exploratory and speculative, and also having due regard to weather and road conditions."

In the event oil of commercial quality and in paying quantities was encountered in the first or any subsequent test well drilled under the Fidelity operating agreement, Fidelity had a definite obligation to continue drilling. It was then obliged to commence the drilling of an additional well or wells within one year from the completion of the first commercial well, and so on, with the purpose of progressively extending the production limits of the anticline toward and upon the lands covered by each Fidelity operating agreement.

Between 1935 and 1938, Fidelity drilled three noncommercial test wells on the anticline. Appellants conceded at the trial, and the court found, that these activities constituted compliance with Fidelity's initial obligation to drill a test well. The last of these wells was abandoned as noncommercial in July or August, 1938.

No additional drilling was done by Fidelity or anyone on its behalf until May, 1941. From September, 1935, through January, 1939, however, Fidelity carried on negotiations with The California Company, with the view of having that company carry forward the program

3. For the purposes of this action, appellant Susan M. Wight disclaimed all interest in the only portion of the lands de-scribed in the complaint which was not within Unit 5.

specified in the Fidelity operating agreements. The California Company conducted a geophysical survey of part of the area, but concluded negotiations and rejected all proposals in January, 1939. Fidelity then entered into negotiations of the same kind with The Carter Oil Company, but limited to Units 8A and 8B. An agreement between Fidelity and Carter was executed in 1940, under which Carter commenced drilling a well within the anticline on May 12, 1941. This proved to be a dry well, and was plugged on January 8, 1942.

There was no more drilling under the Fidelity operating agreements until 1949. During this period, the defense demands of World War II made it difficult to obtain drilling materials. Steel could be obtained only where it could be shown that the drill pipe and well casing would be used in developing established productive fields near available marketing facilities. During 1947, however, Fidelity entered into negotiations with certain parties looking to further development of the anticline. These negotiations resulted in a contract with Husky Refining Company, executed in 1948, under which Husky was to carry forward the anticline development program in Units 8A and 8B. In May, 1949, Husky commenced drilling a well in this area. This was completed as a dry hole in July, 1949.

Early in 1950, Montana-Dakota and Fidelity entered into negotiations with Shell culminating in an agreement executed on April 10, 1951. Under this agreement, Shell undertook to carry on the program contemplated by the Fidelity operating agreements for the development of the Cedar Creek Anticline, including the lands and interests of appellants.

Pursuant to the terms of this agreement, Shell carried on extensive geological and geophysical surveys of the anticline. On July 8, 1951, Shell commenced drilling a well. In January, 1952, this well was completed as the first deep test well on the structure capable of producing oil in commercial quantities.

Since then, and prior to the trial in April, 1955, Shell has made commercial discoveries of oil to the north and south of the lands in which appellants have an interest. During this period, Shell has drilled fifty-three wells within the anticline, and has expended approximately twelve million dollars in conducting the program contemplated by the Fidelity operating agreements. Eleven of these wells were started prior to the time this suit was commenced. These wells alone cost Shell well over three million dollars.

On April 27, 1951, Fidelity and Montana-Dakota by letter advised all of the appellants of the making of the April 10, 1951, agreement with Shell. In this letter, appellants were also advised of Shell's proposed operations under this agreement. Appellants, however, except to the extent noted below, remained silent and made no claim that the Fidelity operating agreements had expired or been terminated, until the filing of this action.

The record before us does not contain the original complaint, and does not show on what date it was filed. The alias summons, however, was filed on February 2, 1953, and the petition for removal and findings of fact recite that the action was filed on or about February 2, 1953. This same information is conveyed in appellants' opening brief at seven different places. In their reply brief, however, it is recited that the suit was commenced on December 3, 1952, and that the amended complaint was filed on February 2, 1953.

All of the development and other activities carried on by appellees were performed in reliance on the fact that the Fidelity operating agreements, covering appellants' interests and other similar interests on the anticline, were valid, subsisting, and in full force and effect. As a result of the development and other activities of appellees, the values of the oil and gas interests on the Cedar Creek Anticline, including the interests of appellants, were greatly enhanced.

The lands in which appellants have an interest are located near the center of the Cedar Creek Anticline. If the relief

prayed for in appellants' complaint is granted, the future development of the area, as planned and carried forward by Shell, will be impaired, and the benefit to be derived by appellees from such development of appellants' lands will be lost.

Based upon these findings, the court concluded, as noted above, that each of the appellants is estopped from obtaining judgment in its favor in this cause.

■ Appellants call attention to the opinion in Gypsy Oil Co. v. Marsh, 121 Okl. 135, 248 P. 329, 335, 48 A.L.R. 876, as containing a concise statement of the essential elements of an estoppel. In this case, it is stated, quoting from Texas Co. v. Pettit, 107 Okl. 243, 220 P. 956, 231 P. 463:

"'The essential elements of an "equitable estoppel" are: First, there must be a false representation or concealment of facts. Second, it must have been made with knowledge, actual or constructive, of the real facts. Third, the party to whom it was made must have been without knowledge, or the means of knowledge, of the real facts. Fourth, it must have been made with the intention that it should be acted upon. Fifth, the party to whom it was made must have relied on or acted upon it to his prejudice. * * * ' " 4

Under the findings of fact summarized above, each of these five elements was expressly, or by necessary implication, found to be present in this case. It follows that the findings of fact support the trial court's conclusion that appellants are barred by estoppel.

Appellants argue, however, that with respect to each of these elements, the findings of fact are clearly erroneous.

■■ If appellants are correct as to any one of these elements of estoppel, the judgment cannot stand, since all five elements must be found to exist. Gerard v. Sanner, 110 Mont. 71, 103 P.2d 314. The burden of proving each of these elements is upon appellees (Waddell v. School District No. 2, supra), and such proof must be by clear, convincing, and satisfactory evidence. Fiers v. Jacobson, 123 Mont. 242, 211 P.2d 968.

■ The first of these elements of estoppel is that there must have been a false representation or concealment of facts. Appellees contend, and the trial court found, that this element is present because appellants concealed from Shell the fact that they were claiming that the Fidelity operating agreements had expired or had been abandoned.

Appellants argue that the evidence does not support a finding that they concealed their claims. Our attention is called to the testimony of John Wight, concerning conversations he had in 1951 or early 1952 with one Gadbois, an agent of Shell. Wight testified that, in the course of these conversations, he offered to arrange a lease of appellants' lands to Shell. The significance of such an offer is that it would indicate to Gadbois that Wight, who seemed to be representing some of the appellants, considered the Fidelity operating agreements no longer in effect. Gadbois was not called as a witness by appellees to dispute Wight's testimony. Citing McCormick on Evidence, 534, appellants ask us to infer, from the failure to call Gadbois as a witness, that his testimony would have been unfavorable to appellees. Wight's undisputed testimony, it is contended, refutes any suggestion of concealment by appellants concerning the existence of their claims.

The trial court apparently found Wight's testimony unconvincing. Our own examination of the record indicates to us that Wight was vague in his recollections, and uncertain as to when and how many times these conversations occurred, and who participated. Under these circumstances, the failure to produce Gadbois as a witness is not significant. We are unable to conclude that the

4.   See, also, Waddell v. School District No. 2, 74 Mont. 91, 238 P. 884.

trial court erred in disregarding Wight's testimony.

Appellants further assert, however, that the finding as to concealment is negatived by evidence showing that appellant Susan Wight sent a notice of cancellation sometime in 1950; that appellant H. C. Smith sent a notice of cancellation on July 16, 1951; and that appellant Cedar Creek Oil and Gas Company sent written notice of its claim on September 12, 1952.

The Susan Wight notice purports to cancel one paragraph of the gas unit agreement. It had nothing to do with the Fidelity operating agreement. Moreover, it was directed only to Montana-Dakota Utilities Company.

In his communication of July 16, 1951, Smith declared forfeited and canceled any interests claimed by virtue of operating agreements which might apply to lands and leases described in the letter. By this time, Shell had already commenced drilling its first well under the agreement of April 10, 1951. Smith sent his letter to Fidelity and Montana-Dakota. There is no indication that a copy of this letter was sent to Shell, although Smith was aware of Shell's interest.[5] It was Shell which was entitled to be informed as to appellants' claims, since Shell was carrying on the active work of developing the anticline. Notice to Fidelity and Montana-Dakota was not notice to Shell.

As in the case of the Smith notice, the Cedar Creek notice of September 12, 1952, was not sent to Shell, but only to Fidelity and Montana-Dakota. In any event, this notice was not placed in the mail until well over a year after Cedar Creek had learned of the Shell agreement. By that time, Shell had expended a substantial sum of money, a number of successful wells had been completed by Shell, and the lands and leases of appellants had been greatly enhanced in value.

Appellants cite Bowes v. Republic Oil Company, 78 Mont. 134, 252 P. 800, for the proposition that they had no duty to advise Shell of their claims unless and until Shell began drilling on their Unit 5 lands. Up to the time of trial, Shell had done no drilling on those lands.

In the Bowes case, however, the court made clear the fact that the holding is not based upon the location of the oil operations, but on the lack of all the necessary elements of estoppel. Moreover, in our case, the lands on which Shell drilled, while held under other permits and leases, were part of a single geological structure which embraced appellants' lands, all of which were included in one comprehensive development plan. In addition, while Shell had not drilled any wells in Unit 5, part of its preliminary geophysical work was performed in that area.

We hold that the finding of fact to the effect that appellants, having received notice shortly after April 27, 1951, of Shell's undertaking to proceed under the Fidelity operating agreements, concealed from Shell, until this action was filed their claims that the operating agreements had been terminated or abandoned, is not clearly erroneous.

The second element essential to establish an equitable estoppel, as announced in the Gypsy Oil Company case, supra, is that the false representation or concealment must have been with knowledge, actual or constructive, of the real fact.

Appellants had actual knowledge of the fact which was being concealed from Shell—their own view that the Fidelity operating agreements had terminated or been abandoned. They must have entertained this view during all the period from April, 1951, when they received notice of the Shell agreement, to the time this action was filed. This is indicated by the fact that appellants contend that the Shell lawyers should also have come

5. Montana-Dakota answered Smith's cancellation notice by a letter dated August 9, 1951. This letter carries the notation at the bottom that a copy was to be sent to Shell Oil Company, Mr. Armin Johnson. The record is silent as to whether this was actually done.

to this view as soon as they read the Fidelity operating agreements. At the very least, appellants had constructive knowledge of the concealed fact during all of this period, for they then knew all the facts upon the basis of which the claim was later asserted.

The finding, implicit in the findings of fact of the trial court, that the concealment was with knowledge, actual or constructive, of the fact concealed, is not clearly erroneous.

The third element essential to prove equitable estoppel is that the party to whom the false representation is made, or from whom the fact is concealed, must have been without knowledge, or the means of knowledge, of the real facts.

Appellants assert that Shell had actual notice of appellants' claim by reason of the Wight-Gadbois conversations, and the Susan Wight, H. C. Smith, and Cedar Creek communications. This contention has already been disapproved in another connection.

It is further contended, however, that Shell may not claim that it was without knowledge of the true facts unless it used reasonable diligence to learn the truth.[6] Appellants urge that Shell failed to discharge this obligation to ascertain the facts. It is said that representatives of Shell knew all the facts concerning previous activities on the anticline since 1934. They should therefore have known, it is contended, that such activities did not constitute exercise of the option to continue drilling after developing a dry well.

In our view, Shell's duty to inquire as to the facts relative to appellants' claims was discharged when appellants were informed of the Shell agreement. By thereafter remaining silent, appellants lulled Shell into a sense of security, and in effect induced Shell to make no independent inquiry. Under these circumstances, Shell is not chargeable with knowledge which might have been gained had such an inquiry been made.

The implicit finding of fact to the effect that Shell was without knowledge or the means of knowledge of the real facts concerning appellants' claims is not clearly erroneous.

■ The fourth element essential to prove equitable estoppel is that the false representation must have been made, or the fact concealed, with the intention of inducing action which would not otherwise be taken. Such intention may be proved by circumstantial evidence. Lacy v. Wozencraft, 188 Okl. 19, 105 P.2d 781.

Appellants argue that intention of that kind on their part in this case is negatived by the Wight-Gadbois conversations and the Smith and Cedar Creek notices. We have already indicated our reasons for believing that the trial court was entitled to disregard this evidence.

Each of the appellants was advised by letter dated April 27, 1951, of the Shell-Fidelity agreement, and that Shell would commence a deep well within ninety days. Appellants' silence after receiving this notice warrants the conclusion that appellants intended Shell to proceed on the assumption that appellants had no objections.

The implied finding of fact, that appellants concealed the facts with the intention of inducing Shell to proceed with the development work, is not clearly erroneous.

The fifth and final essential element to prove equitable estoppel is that the party to whom the false representation was made, or from whom the fact was concealed, acted to his prejudice in reliance upon such representation, or upon the nonexistence of the facts concealed.

The trial court found, in effect, that appellants' concealment of the facts concerning their claim that the Fidelity operating agreements were no longer in effect induced Shell to incur substantial

6. Thorp Finance Corp. v. Le Mire, 264 Wis. 220, 58 N.W.2d 641, 44 A.L.R.2d 189, and Waddell v. School District No. 2, 74 Mont. 91, 238 P. 884, are cited in support of this statement.

expense in proceeding with work under the Fidelity-Shell agreement.

Challenging this finding, appellants first point to the lack of direct evidence as to such reliance. There is no direct testimony, appellants say, that Shell would not have made its agreement with Montana-Dakota and Fidelity, or that it would not have gone ahead with the drilling on the anticline, if, in fact, the Fidelity operating agreements had expired as to the lands here involved. The failure of Shell to call a witness who would give direct testimony as to reliance, appellants also urge, gives rise to the inference that any such testimony would have been unfavorable to appellees.

As in the case of any other issue, the fact of reliance may be proved by circumstantial evidence.[7] A course of action pursued after exposure to a false representation, or after being deceived by a concealed fact, may be better evidence of reliance than a self-serving statement that one did rely. Where such circumstantial evidence is sufficient, the failure to produce a witness to make such a self-serving statement is of no importance.

Here, the circumstantial evidence tending to prove reliance, as accepted by the trial court and reflected in the findings of fact summarized above, is ample. It establishes that the Cedar Creek Anticline is a single geological structure, and that over ninety per cent of the lands therein were committed to the Fidelity operating agreements. Shell, in undertaking the development of the anticline, relied upon the continued effectiveness of these agreements. It cannot reasonably be said that reliance was placed on some of these agreements, but not on all of them. Hence, it is futile to speculate as to what Shell would have done had it known in advance, or at any time thereafter, that any particular percentage of the presumably committed lands were actually not included. Not what Shell

might have done, but what it did do, is the test of reliance.

As against this circumstantial evidence of actual reliance, appellants call attention to items of testimony which, in their view, indicate lack of reliance. In this connection, appellants note that Shell did no drilling in Unit 5 of the Anticline, in which appellants' lands were situated. Most of the wells drilled by Shell were many miles from that unit. All the wells drilled in Unit 5 before Shell entered the picture had turned out dry. Appellants' acreage did not exceed three per cent of the total area covered by the Fidelity-Shell agreement.

The evidence indicates further, however, that Shell was following a definite pattern of drilling, for the purpose of progressively extending the producing limits towards and upon the lands in Unit 5. That previous drilling on Unit 5 had proved unrewarding does not indicate lack of interest in that unit, in the face of the fact that this unit was included in the Fidelity-Shell agreement. Nor does the fact that appellants' permits and leases represented a small part of the total project, percentagewise, negative reliance. Their forty-five hundred acres, while only three per cent of the lands committed to the development, may prove to be an extremely valuable part of the whole. The fact that this suit was brought is some evidence that appellants have a high regard for the oil prospects of their lands. There is no reason why Shell should be credited with less perception.

Appellants call attention to some other items of evidence which, in their opinion, negative a finding of reliance. All of these have been examined, but have been found to afford, singly or collectively, no basis for overturning the findings of fact on this point.

Appellants argue that, having entered into the agreement with Fidelity, Shell was committed to the development pro-

7. May v. City of Kearney, 145 Neb. 475, 17 N.W.2d 448; Hetchler v. American Life Ins. Co., 266 Mich. 608, 254 N.W. 221; Ste. Marie v. Wells, 93 Vt. 398, 108 A. 270.

gram and was legally obliged to continue as to all but Unit 5 lands. Since no work had yet been done on Unit 5 lands, so this argument goes, Shell has done nothing it was not obliged to do, and hence has not relied, to its prejudice, on the commitment of appellants' lands to the project.

The work already performed, as the evidence shows, accords with a systematic plan for the development of the entire anticline. The expenditure of substantial sums in pursuing the pattern of general development will ultimately benefit Unit 5, for it makes development of that unit economically feasible. This benefit which appellants have received is to be compared to the detriment Shell would suffer if the lands in question were now withdrawn from the project. It is this which would prejudice Shell if appellants prevail here. It is a prejudice which would be sustained whether or not Shell could then legally withdraw from the entire project, and whether or not it would withdraw if it could.

The finding of fact as to the element of reliance is not clearly erroneous.

The judgment is therefore sustainable upon the doctrine of equitable estoppel. This was the principal basis of the trial court's decision.

■ In our view, however, the judgment is also sustainable on the ground that appellants failed to prove that the subleases had expired. Appellants, as plaintiffs in this quiet-title action, had the burden of proving that the documents under which appellees claim, concededly valid at their inception, were no longer in effect. They sought to do this by proving that, after completing a dry well, appellees did not exercise their option to do further drilling within the time specified in section 4 of the Fidelity operating agreements. Under that provision, further drilling was to be prosecuted within the time dictated by good oil-field practice in a wildcat area.

■ Appellants therefore had the burden of proving what constitutes good oil-field practice, under such circumstances, in a wildcat area, and that appellees did not conform thereto in the timing of exploratory operations. Appellants failed to maintain this burden. The trial court held that there is no evidence in the record as to what constitutes good oil-field practice, under the circumstances, in a wildcat area. The court believed that it would therefore be necessary to reopen the case for the taking of further evidence if the case were to be decided on this issue. As indicated above, however, the lack of such evidence actually constitutes a failure of proof concerning an allegation indispensable to appellants' case. Appellants were not entitled to another opportunity to submit proof on this issue.

Affirmed.